# **EXHIBIT A**

THE SPECTRUM CAPITAL GROUP LLC
*Investment and Merchant Bankers*

August 1, 2004

Mr. Stephen P. Conway
CEO
Lucor, Inc.
Raleigh, NC

Dear Stephen:

This letter (the "Agreement") will confirm the understanding and agreement between Lucor, Inc., and its subsidiaries and affiliates (together "Lucor" or the "Company") and The Spectrum Capital Group, LLC ("SCG"), regarding the scope and terms of the retention of SCG as the Company's exclusive investment bankers and financial advisors in connection with the matters set forth below in Section 1 of the Agreement.

Section 1. Services to be Rendered. SCG will perform such services as the Company may request including, but not limited to, the following:

a) SCG will assist Lucor in devising and assessing alternative financial strategies for its business;

b) SCG will review and analyze the business plans and financial projections prepared by the Company including but not limited to testing assumptions and comparing those assumptions with historical Company and industry trends;

c) SCG will assist the Company and its other professionals in formulating and negotiating an out-of-court plan to restructure Lucor's indebtedness being serviced by GMAC Commercial Mortgage ("GMAC");

d) SCG will advise the Company as to its debt capacity in connection with its restructuring;

e) SCG will advise the Company and participate in negotiations in connection with one or more possible transactions to re-finance Lucor's indebtedness being serviced by GMAC;

f) Should any litigation between the Company and GMAC ensue from the Company's attempts to restructure and re-finance Lucor's indebtedness being serviced by GMAC, SCG shall advise the Company as to the financial implications of such litigation; and



PENGAD-Bayonne, N. J.
EXHIBIT
A

g) SCG will render such other financial advisory and investment banking services as may be agreed upon by SCG and the Company in connection with the foregoing.

In rendering services to Lucor hereunder, SCG is not assuming any responsibility for the Company's decision to effect or not effect any transaction.

Section 2. Information Provided by the Company. The Company will furnish SCG with such information as SCG and the Company agrees is appropriate to enable SCG to render services hereunder (all such information being the "Information"). The Company recognizes and confirms that SCG (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having assumed any obligation to independently verify the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, and (c) will not act in the official capacity of an appraiser of specific assets of the Company or any other party. The Company confirms that the Information to be furnished by the Company, when delivered, will be true and correct in all material respects, will be prepared in good faith, and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contain therein not misleading. The Company will promptly notify SCG if it learns of any material inaccuracy or misstatement in, or material omission from, any information theretofore delivered to SCG.

Section 3. Fees. As compensation for the services rendered hereunder, the Company, and its successors, if any, agrees to pay SCG (via wire transfer or other mutually acceptable means) the following fees in cash:

a) A monthly cash advisory fee (the "Monthly Fee") equal to $25,000 per month for a minimum of three months. After six months, the Monthly Fee shall be reduced to $15,000. Monthly Fees paid after the first anniversary of this Agreement shall be applied as a credit to any amounts that may become due to SCG under Sections 3(b) and (c) hereof. The Monthly Fee shall be payable in advance on the monthly anniversary date of this Agreement.

b) A minimum restructuring or reorganization fee (the "Reorganization Fee") equal to $750,000 (seven hundred fifty thousand dollars) provided that the Company successfully completes a material out-of-court restructuring of the Company's indebtedness being serviced by GMAC. An out-of-court restructuring shall be defined as a refinancing or consensual modification of the original loan terms and/or conditions including but not limited to a material change in any of the following items: principal due, remaining term, interest rate, financial covenants or collateral on any loan obligation currently serviced by GMAC.

c) A re-financing fee (the "Financing Fee") of 1.00% of the commitment made by the Company's lender(s) to a re-financing of Lucor's indebtedness being serviced by GMAC and accepted by the Company, but not less than $250,000. Additional Financing

Fees shall be negotiated between SCG and the Company if SCG is requested to arrange any additional financing for Lucor.

Section 4. Expenses. Without in any way reducing or affecting the provisions of Exhibit A hereto, Lucor shall reimburse SCG for its reasonable out-of-pocket expenses incurred in connection with the provision of services hereunder; provided, however, SCG shall not incur expenses in excess of $5,000 during any calendar month without first having obtained the Company's approval. Out-of-pocket expenses also shall include, but not be limited to, travel and lodging, research and courier services. As a matter of practice, SCG does not seek reimbursement for staff overtime, copying, fax, telephone and like charges unless such charges are extraordinary. The Company shall promptly reimburse SCG upon presentation of an invoice or similar documentation.

Section 5. Indemnity. The Company agrees to the provisions of Exhibit A hereto which provide for certain indemnification by the Company of SCG and certain related persons. Such indemnification is an integral part of this Agreement and the terms thereof are incorporated by reference herein. Such indemnification shall survive any termination, expiration or completion of SCG's engagement hereunder.

Section 6. Term. The term of SCG's engagement shall extend from the date hereof through the date the Company consummates an out-of-court restructuring; provided, however, that either the Company or SCG can cancel this Agreement by providing notice in writing (the "Term"); provided further, however, that in the event SCG cancels this Agreement, it shall not be entitled to receive any further fees hereunder from the date of cancellation forward, other than any fees payable pursuant to the last sentence of this paragraph; and provided further, however, that except in the event of gross negligence or willful misconduct by SCG, the Company may not cancel this Agreement prior to the expiration of a three-month period from the date hereof, and then, only upon providing thirty (30) days advance notice in writing. If terminated, SCG shall be entitled to any fees for any monthly period that are due and owing to SCG upon the effective date of termination; provided, however, such amounts will be pro-rated for any incomplete monthly period of service, and SCG will be entitled to the reimbursement for the out-of-pocket expenses described in Section 4. Termination of the Agreement hereunder shall not affect or impair the Company's continuing obligation to indemnify SCG and certain related persons as provided in Exhibit A and its continuing obligations under Section 7 hereof. Without limiting the foregoing, compensation shall be payable under Section 3(b) or (c) above in the event that a restructuring or re-financing transaction is consummated at any time prior to the expiration of eighteen months after such termination, or a letter of intent or definitive agreement with respect to a Reorganization or Transaction is executed at any time prior to eighteen months after such termination (which letter of intent or definitive agreement subsequently results in the consummation of a restructuring or re-financing transaction at any time), (y) as to which SCG provided material advice to the Company hereunder prior to the termination of this Agreement, or (z) which involves a party identified to the Company by SCG or with whom the Company had material discussions regarding a restructuring.

Section 7. Miscellaneous.

a) Sections 2 through 7 shall survive termination or expiration of the Agreement.

b) SCG shall be under no obligation to provide formal fairness, valuation or solvency opinions (except to the extent valuation opinions are embodied in testimony) with respect to any of the proceedings or transactions contemplated hereby or incidental hereto. However, SCG and its affiliates shall be provided the option to do so where such opinions are necessary and are appropriate. The terms of such engagement shall be customary for such services rendered by investment banking firms at the time of the engagement and shall be subject to one or more separate agreements between the Company and SCG.

c) The advice (oral or written) rendered by SCG pursuant to this Agreement is intended solely for the benefit and use of the Company and its professionals in considering the matters to which this Agreement relates, and the Company agrees that such advice may not be relied upon by any other person, used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose, nor shall any public references to SCG be made by the Company, without the prior written consent of SCG.

d) The Company agrees that SCG shall have the right upon engagement and after completion of each Transaction to place advertisements in financial and other newspapers and journals at its own expense describing its investment and merchant banking services hereunder. SCG shall submit such advertisements in advance to the Company for its approval, which shall not be withheld unreasonably, relative to the content and timing of such advertisements.

d) This Agreement may not be amended or modified except by a writing executed by each of the parties and this Agreement, including all controversies arising from or relating to performance under this Agreement, shall, be governed by and construed in accordance with the laws of the State of North Carolina, without giving effect to such state's rules concerning conflicts of law. The provisions of this Agreement, including, without limitation, the obligation to make the payments set forth in Sections 3, 4 and 5, shall be binding on the Company and its successors and assigns.

i) The relationship of SCG to the Company hereunder shall be that of an independent contractor and SCG shall have no authority to bind, represent or otherwise act as agent for the Company.

We very much look forward to assisting Lucor in this most important endeavor. If the foregoing correctly sets forth the understanding and agreement between SCG and the Company, please so indicate by signing the enclosed copy of this letter, whereupon it shall become a binding agreement between the parties hereto as of the date first above written.

Very truly yours,

THE SPECTRUM CAPITAL GROUP, LLC

By: ____________________
Michael G. Lederman
Managing Partner

Accepted and Agreed to as of
The day first written above:

LUCOR, INC.

By: ____________________
Stephen P. Conway
CEO

**Exhibit A**

The Company shall defend, indemnify and hold harmless SCG and its partners, affiliates, counsel and other professional advisors, and the respective directors, officers, controlling persons, agents and employees of each of the foregoing (SCG and all of such other persons collectively, the "Indemnified Parties"), from and against any losses, claims or proceedings including stockholder actions, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards, other liabilities, costs, fees and expenses (collectively, "Losses") (i) related to or arising out of (A) oral or written information provided by the Company, the Company's employees or other agents, which either the Company or SCG provides to any persons, or (B) other action or failure to act by the Company, the Company's employees or other agents or SCG at the Company's request or with the Company's consent, or (ii) otherwise related to or arising out of the engagement of SCG under this Agreement or any transaction or conduct in connection therewith, provided that this clause (ii) shall not apply to the extent it is finally judicially determined by a court of competent jurisdiction that such Losses arose out of the gross negligence or bad faith of such Indemnified Party. If multiple claims are brought against an Indemnified Party in an arbitration, with respect to at least one of which indemnification is permitted under applicable law and provided for under this Agreement, the Company agrees that any arbitration award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for, except to the extent the arbitration award expressly states that the award, or any portion thereof, is based on a claim as to which indemnification is not available.

The Company shall further reimburse any Indemnified Party promptly for, or at the Indemnified Party's option advance amounts sufficient to cover, any legal or other fees or expenses as they are incurred (i) in investigating, preparing or pursuing any action or other proceeding (whether formal or informal) or threat thereof, whether or not in connection with pending or threatened litigation or arbitration and whether or not any Indemnified Party is a party (an "Action") and (ii) in connection with enforcing such Indemnified Party's rights under this Agreement (including, without limitation, its rights under this Exhibit A; provided, however, that to the extent it is finally judicially determined by a court of competent jurisdiction that the Losses of such Indemnified Party arose out of the gross negligence or bad faith of such Indemnified Party, such Indemnified Party will promptly remit to the Company any amounts reimbursed or advanced under this paragraph.

The Company shall assume the defense of any such Action including the employment of counsel reasonably satisfactory to SCG and will not settle, compromise, consent or otherwise resolve or seek to terminate any pending or threatened Action (whether or not any Indemnified Part is a party thereto) unless it obtains the prior written consent of SCG an express, unconditional release of each Indemnified Party from all liability relating to such Action and the engagement of SCG under this Agreement. Any Indemnified Party shall be entitled to retain separate counsel of its choice and participate in the defense of any Action in connection with any of the matters to which this Exhibit A relates, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless: (i) the Company has failed promptly to assume the defense and employ counsel or (ii) the named parties to any such Action (including any impleaded parties) include such Indemnified Party and the Company, and such Indemnified Person shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Company; provided that the Company shall not in such event be responsible under this Exhibit A for the fees and expenses of more than one firm of separate counsel ( in addition to local counsel) in connection with any such Action in the same jurisdiction.

The Company agrees that if any right of any Indemnified Party set forth in the preceding paragraphs is finally judicially determined to be unavailable (except by reason of the gross negligence or bad faith of such Indemnified Party), or is insufficient to hold such Indemnified Party harmless against such Losses as contemplated herein, then the Company shall contribute to such Losses (i) in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and such Indemnified Party, on the other hand, in connection with the transactions contemplated hereby, and (ii) if (and only if) the allocation provided in clause (i) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Company and such Indemnified Party; provided, however, that in no event shall the amount, if any, to be contributed by all Indemnified Parties exceed the amount of the fees actually received by SCG hereunder. Benefits received (or anticipated to be received) by the Company shall be deemed to be equal to the aggregate cash consideration and value of securities or any other property payable, exchangeable or transferable in any proposed or potential transactions within the scope of this Agreement, and benefits received by SCG shall be deemed to be equal to the compensation payable by the Company to SCG in connection with this Agreement. Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct related to information provided by the Company or other conduct by the Company (or the Company's employees or other agents) on the one hand or by SCG on the other hand. The parties agree that it would not be just and equitable if contribution were determined by pro rata allocation or by any other method of allocation which does not take into account the equitable considerations referred to above.

The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with advice or services rendered or to be rendered by any Indemnified Party pursuant to this Agreement, the transactions contemplated hereby or any Indemnified Party's actions or inactions in connection with any such advice, services or transactions except for Losses of the Company that are finally judicially determined by a court of competent jurisdiction to have arisen out of the gross negligence or bad faith of such Indemnified Party in connection with any such advice, actions, inactions or services.

The rights of the Indemnified Parties hereunder shall be in addition to any other rights that any Indemnified Party may have at common law, by statute or otherwise. Except as otherwise expressly provided for in this Exhibit A, if any term, provision, covenant or restriction contained in this Exhibit A is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement all remain in full force and effect and shall in no way be affected, impaired or invalidated. The reimbursement, indemnity and contribution obligations of the Company set forth herein shall apply to any modification of this Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Person's services under or in connection with, this Agreement.