UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE SPECTRUM CAPITAL GROUP, LLC<br><br>Plaintiff,<br><br>v.<br><br>LUCOR, INC.<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 07-075ML |

**PLAINTIFF THE SPECTRUM CAPITAL GROUP, LLC'S OBJECTION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER**

Plaintiff The Spectrum Capital Group, LLC ("Spectrum") hereby objects to Defendant Lucor, Inc.'s Motion to Dismiss or, in the Alternative, to Transfer. In support of its Objection, Spectrum relies upon the accompanying Memorandum of Law and supporting Affidavit and Exhibits.

THE SPECTRUM CAPITAL GROUP, LLC

By its Attorneys,

/s/ Heather A. Pierce
Heather A. Pierce (#7345)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (Fax)
hpierce@eapdlaw.com

and

Steven M. Cowley (*pro hac vice*)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199-7613
(617) 239-0100
(617) 227-4420 (Fax)
scowley@eapdlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7th, 2007, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Heather A. Pierce

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE SPECTRUM CAPITAL GROUP, LLC<br><br>Plaintiff,<br><br>v.<br><br>LUCOR, INC.<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 07-075ML |

**PLAINTIFF THE SPECTRUM CAPITAL GROUP, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER**

For the reasons set forth below, Plaintiff The Spectrum Capital Group, LLC ("Spectrum") opposes Defendant Lucor, Inc.'s ("Lucor") Motion to Dismiss or, in the Alternative, to Transfer ("Motion to Dismiss").

## INTRODUCTION

Lucor contends that this Court lacks personal jurisdiction over it because it does not have sufficient contacts with the state of Rhode Island, but the factual allegations that Lucor relies upon in making its argument are both incomplete and inaccurate. Lucor simply ignores the voluminous record of its contacts with Rhode Island in connection with the service agreement underlying this case, and instead conclusorily minimizes its contacts with this state. Contrary to Lucor's unsupported allegations, the actual record, as described below, unequivocally establishes that Lucor has sufficient contacts with Rhode Island to be properly subjected to the jurisdiction of this Court.

Lucor's willingness to mischaracterize or misstate the facts relating to its contacts with Rhode Island is illustrated by its false representation that the Agreement at issue in this case between Lucor and Spectrum was executed while Spectrum's Michael Lederman was visiting

Lucor's offices in North Carolina, a misstatement that forms the crux of Lucor's jurisdictional challenge. Despite a clear record establishing that this representation is not true -- the parties exchanged e-mails on August 4 and 5 still negotiating revisions to a draft agreement -- Lucor relied upon this misstatement throughout its original Memorandum in Support of its Motion to Dismiss, and even submitted two Affidavits attesting that it is true. Spectrum then drew Lucor's counsel's attention to the record establishing that the Agreement was not, in fact, executed while Mr. Lederman was in North Carolina, but was instead negotiated and then executed by the parties exchanging communications, and then the signed Agreement, by electronic, then paper, mail **between** Rhode Island and North Carolina. In the face of Spectrum's letter, Lucor filed a Supplemental Memorandum backpedaling from its original misstatements, but only to pose a new alternative theory of how the Agreement was supposed to have been executed in North Carolina that accounts for the e-mails not disclosed originally.[1]

Lucor's misstatements regarding the execution of the Agreement between Lucor and Spectrum are just one example of the extreme liberties that Lucor has taken with its description of the events and circumstances surrounding its engagement and retention of Spectrum whereby Spectrum acted as advisor and consultant to Lucor from its Rhode Island office for a more than two year period. The truth is that Spectrum has maintained its principal, indeed sole, place of business in Rhode Island since before Spectrum and Lucor entered into the Agreement at issue in this case. There were never any contacts between Spectrum and Lucor while Spectrum was located in New Mexico, before its move to Rhode Island. Simply by reading the signature line of e-mails exchanged before the Agreement was executed, Lucor was well aware that it was negotiating with a Rhode Island company. In fact, the Agreement itself contains Spectrum's

[1] It is worth noting that Lucor has not provided this Court, or Spectrum, with an explanation for its failure to inform the Court originally about the existence of these material e-mails, even though they are records Lucor presumably had in its possession when its principals signed the misleading Affidavits at issue.

Rhode Island address on the bottom of each page. In short, Lucor's ongoing representation that it did not intend to contract with a Rhode Island company, but is instead being called into this jurisdiction solely by virtue of Spectrum's "unexpected and unilateral move" to Rhode Island following the formation of the Agreement (Lucor's Memorandum in Support of its Motion to Dismiss ("Lucor's Memorandum"), at 12), is simply false.

In addition to its misstatements concerning its negotiation and execution of the Agreement, Lucor also glosses over and mischaracterizes its contacts with Rhode Island following the execution of the Agreement. For twenty-nine months, Lucor engaged Spectrum to consult and advise, and even to act as representative negotiating with third-party creditors on behalf of Lucor. Through the literally hundreds of e-mails, telephone calls and mailings that it has directed into Rhode Island in connection with this relationship, Lucor has purposefully availed itself of the benefits of doing business in this jurisdiction. Lucor fails to inform this Court of dozens of payments that it has mailed into Rhode Island, as well as the numerous substantive e-mails and telephone calls that it has directed into Rhode Island seeking Spectrum's advice and services. Similarly, Lucor fails to acknowledge or discuss all of the services that Spectrum has performed for Lucor from its Rhode Island offices. Instead, Lucor's Memorandum in Support of its Motion to Dismiss places undue emphasis on the fact that no one from Lucor has ever traveled to Rhode Island in connection with the Agreement—a fact that is in no way determinative of jurisdiction.

Based on a consideration of the real facts underlying the parties' transactions, and for the reasons set forth below, this Court should deny Lucor's Motion to Dismiss for lack of personal jurisdiction. In addition, this Court should deny Lucor's Motion to Dismiss for improper venue and Lucor's Motion to Transfer because venue in Rhode Island is both proper and convenient.

**BACKGROUND**

Plaintiff Spectrum is an investment and merchant banking firm incorporated under the laws of Delaware. (Complaint ("Compl."), ¶ 2.) Spectrum has had its sole place of business in Rhode Island since June 2004, and, as Lucor concedes, has been registered with the Rhode Island Secretary of State since at least August 3, 2004. (Affidavit of Michael G. Lederman ("Lederman Aff."), attached hereto as Exhibit 1, at ¶ 1; Lucor's Memorandum, at 4.) Prior to moving to Rhode Island, Spectrum was located in New Mexico. (See Lederman Aff., at ¶ 3.)

Michael G. Lederman ("Lederman"), Managing Partner of Spectrum, was first contacted regarding working with Lucor on or around June 15, 2004, by another financial advisor/investment banker and former client of Spectrum's, Don Draughon ("Draughon"). (Id.) By the time that Draughon first contacted Lederman regarding Lucor, Lederman, and Spectrum, were already in the process of moving from New Mexico to Rhode Island. (Id.) In fact, at the time of Lederman's first contact with Stephen P. Conway ("Conway"), CEO of Lucor, on or about June 16, 2004, Lederman was literally on the road traveling to Rhode Island. (Id. at ¶ 4.) Accordingly, there were never any contacts between Spectrum and Lucor while Spectrum was located in New Mexico.[2] (Id.)

Following this initial contact, Lederman and Conway began negotiating an agreement whereby Spectrum would act as Lucor's investment banker and financial advisor in connection with the restructuring of certain of Lucor's indebtedness being serviced by GMAC Commercial Mortgage ("GMAC") (the "Agreement"). (Id. at ¶ 5.) Many of these negotiations were

[2] Although Lucor points out in its Supplemental Memorandum in Support of its Motion to Dismiss that it received one e-mail from Lederman dated August 4, 2004 that contained a New Mexico address for Spectrum in the signature block, this was solely due to the fact that this e-mail was sent from Lederman's laptop, as opposed to his office computer, and he had not yet updated his laptop's automatic signature line for e-mails to reflect Spectrum's Rhode Island address. (Lederman Aff., at ¶ 9.) In fact, no e-mails were sent from Spectrum to Lucor while Spectrum was located in New Mexico. (Id. at ¶ 4.) Although Lucor had received other e-mails from Spectrum, prior to this August 4, 2004 e-mail, which contained Spectrum's Rhode Island address (id. at ¶¶ 6,7), Lucor chose not to inform this Court of their existence.

conducted via e-mails between Conway and Lederman, while Spectrum was located in Rhode Island. (Id. at ¶ 6.) For example, on July 15, 2004, Lederman and Conway negotiated via e-mail regarding the fee arrangement to be included in the Agreement. (Id.) The signature block included in the e-mail contained Spectrum's Rhode Island address, leaving no doubt that Lucor was negotiating with a Rhode Island company. (Id.)

Lederman thereafter drafted a services Agreement. (Id. at ¶ 7.) The Agreement was drafted by Lederman in Rhode Island and a draft was e-mailed to Conway. (Id.) The July 24, 2004 e-mail to Conway attaching the draft Agreement also contained Spectrum's Rhode Island address in the signature block, giving Lucor further notice that it was about to enter into a contractual relationship with a Rhode Island company. (Id.) In addition, the draft Agreement attached to the e-mail contained Spectrum's Rhode Island address at the bottom of each page. (Id.)

On or about August 2, 2004, Lederman traveled from Rhode Island to North Carolina and, on August 3, 2004, met with Conway to discuss the Agreement. (Id. at ¶ 8.) During this meeting, Lederman and Conway specifically discussed the fact that Spectrum was located in Rhode Island. (Id.) Later that same day, Lederman left North Carolina. (Id.) The parties thereafter continued to negotiate the terms of the Agreement via e-mail. (Id. at ¶ 9.) On August 4, 2004, Lederman e-mailed a new draft of the Agreement to Conway, incorporating changes that they had discussed during their meeting, and making arrangements for the Agreement's execution. (Id.) On August 5, 2004, Conway e-mailed Lederman with another proposed change to the Agreement. (Id. at ¶ 10.) Upon information and belief, the Agreement was thereafter executed by Conway signing a copy of the Agreement and mailing it back to Spectrum, in Rhode Island, where Lederman then signed it. (Id. at ¶ 11.) The final Agreement,

as signed and returned to Spectrum by Lucor, contained Spectrum's Rhode Island address at the bottom of each page.

On August 10, 2004, Spectrum received from Lucor a check for $25,000, dated August 6, 2004, which was in payment of Lucor's first monthly fee pursuant to the Agreement. (Id. at ¶ 12.) This check was made payable to the order of "The Spectrum Capital Group, 471 Hope Street, Bristol, RI 02809," and was mailed to Spectrum's Rhode Island address. (Id.) Following this initial payment, Lucor has mailed no less than thirty other checks into Rhode Island in payment of monthly fees and other expenses, totaling more than $450,000. (Id. at ¶ 13.) In addition, Lucor has sent at least four overnight packages to Spectrum containing CDs of Lucor's financial data to be analyzed by Spectrum at its Rhode Island office. (Id. at ¶ 14.) Similarly, Lucor has sent at least one fax to Spectrum's Rhode Island fax number, and wired at least one payment to Spectrum into Rhode Island. (Id. at ¶ 15.)

Spectrum has also received well over 100 substantive e-mails, sent into Rhode Island by Lucor's representatives and agents, in connection with the services that Spectrum was providing to Lucor under the Agreement. (Id. at ¶ 16.) In addition, Lucor's representatives and agents have also placed dozens, if not hundreds, of telephone calls to Spectrum in Rhode Island. (Id. at ¶ 17.) These e-mails and telephone calls directed at Spectrum in Rhode Island were initiated by numerous individuals acting on behalf of Lucor, including the following: Stephen Conway, CEO of Lucor; Jerry Conway, President of Lucor; Ken Carr ("Carr"), CFO of Lucor; John Northern, Lucor's bankruptcy attorney; Dick Hutson, another bankruptcy attorney working with Lucor; and Jamie Clark, Lucor's corporate attorney. (Id. at ¶¶ 16-18.)

Contrary to Lucor's claim that Spectrum's services were directed to its place of business in North Carolina, many of the services that Spectrum provided to Lucor pursuant to the

Agreement were performed in Spectrum's Rhode Island office. (Id. at ¶ 19.) In response to inquiries from Lucor, Spectrum routinely provided Lucor with advice and other services via telephone and e-mail in its Rhode Island office. (Id.) These inquiries from Lucor included, among other things, numerous e-mails from Conway and Carr to Lederman and Joe Sands ("Sands"), another Partner of Spectrum, in Rhode Island. (Id. at ¶¶ 19-25.) In these e-mails, Conway and Carr sought advice and guidance from Lederman and Sands on a variety of topics.[3] (Id.)

In addition to providing advice and consultation to Lucor from Rhode Island, Spectrum also performed other services from Rhode Island as part of its performance under the Agreement. (Id. at ¶ 26.) For example, Spectrum communicated with GMAC and other third parties from its Rhode Island offices as part of its efforts to restructure Lucor's debt. (Id.) In fact, there were dozens of e-mails and telephone calls between Spectrum and these third parties relative to the services that Spectrum was providing to Lucor. (Id.) These efforts by Spectrum included communications with the following individuals: Conrad Nelson, GMAC's senior asset manager; Ron Ortel, Joel Holsinger, Krystal Black and Jennifer Price of Navigant Consulting, GMAC's financial advisors; employees of GE Capital; and Charles Teitelbaum, legal counsel to Shell Oil Products US. (Id.)

Spectrum provided these services for Lucor without incident for over two years, from August 2004 through December 2006, and, throughout this time, Lucor made monthly payments to Spectrum in Rhode Island as set forth in the Agreement. (Id. at ¶ 19.) Spectrum worked from its Rhode Island office to restructure underlying debt for Lucor that was located around the country, not solely in North Carolina or Georgia, as Lucor erroneously alleges. (Id. at ¶ 27.)

---

[3] True and accurate copies of several of these e-mails are attached as Exhibits J through O to Lederman's Affidavit. (Lederman's Aff., at ¶¶ 19-25.)

In addition to its contacts with Spectrum in Rhode Island, Lucor has also had other contacts with Rhode Island related to the restructuring of the debt that is the subject of the parties' Agreement. (See id. at ¶ 28.) In fact, upon information and belief, the GMAC asset manager assigned to Lucor's case at the time that Spectrum came into contact with Lucor, Rob Ells ("Ells"), was located in Rhode Island. (Id.) Lucor undoubtedly had numerous contacts with Ells prior to its engagement of Spectrum regarding the restructuring of its debt being serviced by GMAC. (See id.) Accordingly, even prior to entering into its Agreement with Spectrum, Lucor intentionally directed communications and other efforts to renegotiate its debt into the state of Rhode Island. (See id.)

On February 27, 2007, Spectrum filed a Complaint against Lucor in this Court alleging that Lucor had breached the terms of the Agreement by failing to pay the reorganization fee due to Spectrum under the Agreement. (Compl., ¶¶ 14-17.) Lucor thereafter filed its Motion to Dismiss for lack of personal jurisdiction. On or about April 20, 2007, Spectrum, through its counsel, sent a letter to Lucor's counsel identifying some factual inaccuracies contained in Lucor's Memorandum in Support of its Motion to Dismiss, as well as in the accompanying Affidavits of Conway and Michael Davis ("Davis"). Specifically, Spectrum presented Lucor with two e-mails between Lederman and Conway, dated August 4, 2004 and August 5, 2004, which established that Lucor's representations in its Memorandum and accompanying Affidavits that the Agreement was executed in North Carolina during an in-person meeting at Lucor's office were false. In response to this letter, Lucor filed its Supplemental Memorandum and Supplemental Affidavits of Conway and Davis. Despite the evidence establishing that negotiations regarding the Agreement were ongoing after Lederman's visit to North Carolina and that the Agreement was, in fact, negotiated and executed based on communications between

Rhode Island and North Carolina, Lucor continues to maintain in its supplemental filings that the Agreement was formed in North Carolina. (Lucor's Supplemental Memorandum in Support of its Motion to Dismiss ("Lucor's Supplemental Memorandum"), at 5.)

## ARGUMENT

### I. The Court Should Deny Lucor's Motion To Dismiss For Lack Of Personal Jurisdiction Because This Court Has Specific Jurisdiction Over Lucor.

In determining whether Lucor has sufficient contacts with Rhode Island for this Court to exercise specific personal jurisdiction, the Court should apply the three-prong test adopted by the First Circuit:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's forum-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

Nowak v. Tak How Invs., LTD, 94 F.3d 708, 712-13 (1st Cir. 1996). See also Northeastern Land Servs., LTD. v. Schulke, 988 F.Supp. 54, 57 (D.R.I. 1997). As set out more fully below, each of these three prongs is met in the instant case and, accordingly, this Court has specific personal jurisdiction over Lucor.

#### A. Spectrum's Claims Directly Arise Out of, and Relate to, Lucor's Contacts with Rhode Island

Lucor's Memorandum mischaracterizes the law on the "arising out of" factor, and improperly focuses it relatedness argument solely on Lucor's contacts with Rhode Island as they relate to the formation of the Agreement. In fact, the proper inquiry is much broader. It is well established in the First Circuit that, in a contract case, the court "must look to the elements of the cause of action and ask whether the defendant's contacts with the forum were instrumental either

in the formation of the contract *or* in its breach." Phillips Exeter Acad. V. Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999) (emphasis added); see Microfibres, Inc. v. Squires Hightech Corp., No. CA04-21-T, 2006 WL 305975, at *5 (D.R.I. Feb. 8, 2006). That the Court's specific jurisdiction inquiry does not solely focus on the formation of the contract, as suggested by Lucor, is established by the following oft-quoted reasoning of the Supreme Court:

> [A] contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (1985). See also Lantor, Inc. v. Nicassio Corp., No. CA06-46S, 2007 WL 204015, at *6 (D.R.I. Jan. 24, 2007); Microfibres, Inc., 2006 WL 305975, at *5; Dynamic Concepts, Inc. v. Modern Chain Mfg. Co., Inc., 610 F.Supp. 285, 288 (D.R.I. 1985).

Lucor's contacts with Rhode Island were instrumental in the formation of, course of dealings under, and breach of the Agreement at issue in this case. As set out above, the terms of the Agreement were negotiated in large part via e-mails to and from Rhode Island. (See Lederman Aff., at ¶ 6.) The meeting that took place between Lucor and Spectrum at Lucor's North Carolina office, on which Lucor places almost obsessive focus, was but one discussion between the parties leading to their Agreement. And, contrary to Lucor's false representation, the Agreement was not formed or executed while Lederman was in North Carolina. (See id. at ¶¶ 9-10.) Instead, the evidence unequivocally establishes that negotiations regarding the contract were ongoing both before and after Lederman's brief visit to North Carolina and the Agreement was executed by the parties in both Rhode Island and North Carolina, then mailed in between.

(See id. at ¶¶ 9-11.) See Brian Jackson & Co. v. Eximias Pharm. Corp., 248 F.Supp.2d 31, 35 (D.R.I. 2003) (finding that the relatedness requirement for personal jurisdiction was satisfied where "the agreement was negotiated and formed, at least on [Plaintiff's] end, in Rhode Island"). Although Lucor now argues in its Supplemental Memorandum that jurisdiction is proper in North Carolina, and not Rhode Island, because "a meeting of the minds occurred in the Raleigh meeting" (Lucor's Supplemental Memorandum at 2.) the language of Lederman's August 4, 2004 e-mail to Conway belies this argument:.

> I've attached the engagement letter with the changes we discussed. If you would return two executed copies to me via FedEx together with the August retainer, I'll return a signed copy to you *and we'll get going together in earnest.* (Emphasis added.)

(Lederman's Aff., at Exhibit D.) Lederman made clear that Spectrum had no intention of being bound by the terms discussed in North Carolina unless, and until, Lucor mailed two executed copies of the revised Agreement and its August retainer to Spectrum in Rhode Island. Lucor attempts to backhand this inconvenient fact by arguing that "[t]he 'formalities of contract execution are not determinative for purposes of jurisdiction.'" (Lucor's Supplemental Memorandum, at 4.) This is an interesting disclaimer for Lucor to make given that its entire jurisdictional challenge centers on the physical location of the parties at the single moment in time that -- according to Lucor -- the terms of the Agreement were essentially reached, while completely ignoring all of Lucor's prior and subsequent contacts with Rhode Island surrounding the negotiation and execution of the Agreement.

The plain fact is that the Agreement was reached and executed, in part, in Rhode Island. Moreover, the course of dealings between the parties involved numerous intentional contacts by Lucor with Rhode Island, over a sustained period of time. Lucor's course of dealings in Rhode Island included the mailing of over thirty monthly payments into Rhode Island, as well as the

sending of numerous other mailings and at least one fax into Rhode Island. (See Lederman Aff., at ¶¶ 13-15.) Lucor's agents and representatives have also initiated countless telephone calls and e-mails to Spectrum in Rhode Island seeking advice and other consulting services pursuant to the Agreement. (Id. at ¶ 19.) Daynard v. Ness, Motley, Loadholt, Richardson & Poole, 290 F.3d 42, 55 (1st Cir. 2002) ("For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal."); United Elec. Radio and Mach. Workers of Am. (UE) v. 163 Pleasant St. Corp., 987 F.2d 39, 45 n.3 (1st Cir. 1993) ("[T]he contacts of a corporation's agent obviously can subject the corporation to the personal jurisdiction of the forum in which those contacts occur."). In fact, many of the services that Lucor has failed to properly compensate Spectrum for were performed at Spectrum's office in Rhode Island and arose directly out of Lucor's contacts with Spectrum in Rhode Island. See Lantor, Inc., 2007 WL 204015, at *8 (finding that the element of relatedness was satisfied where the defendant had ordered certain materials from Plaintiff, which were shipped from Rhode Island, and then refused to pay for those materials). Additionally, upon information and belief, Lucor has also directed numerous contacts related to the efforts to restructure its debt that underlie the Agreement at issue here to GMAC's asset manager Rob Ells, who is also located in Rhode Island. (Lederman Aff., at ¶ 28.) Accordingly, the "parties prior negotiations and contemplated future consequences . . . and the parties' actual course of dealing . . . support a finding of relatedness." Lantor, Inc., 2007 WL 204015, at *8 (quoting Daynard, 290 F.3d at 52).

### B. Lucor Has Purposely Availed Itself of the Privilege of Conducting Activities in Rhode Island

Lucor has purposely availed itself of the privilege of conducting activities in Rhode Island because Lucor's conduct in Rhode Island was both voluntary and of such a nature as to make it reasonably foreseeable that Lucor might be sued in Rhode Island. Nowak, 94 F.3d at

716; Lantor, Inc., 2007 WL 204015, at *8; Microfibres, Inc., 2006 WL 305975, at *6. Lucor voluntarily entered into a business relationship with Spectrum and thereby created a continuing relationship and obligation with a Rhode Island company. See Northeastern Land Servs., LTD. 988 F.Supp. at 58 ("[I]n reaching out beyond one state and creating continuing relationships and obligations with the citizens of another state one subjects oneself to the jurisdiction of the other state for the consequences of one's activities.") (internal citations omitted). In arguing that it did not voluntarily avail itself of the privilege of conducting business in Rhode Island, Lucor places undue emphasis on the fact that none of its employees, agents, and representatives ever traveled to Rhode Island in connection with the Agreement at issue in this case. (Lucor's Memorandum, at 11.) It is well-established, however, that "the mere lack of physical contacts cannot be determinative of where jurisdiction may be exercised." Dynamic Concepts, Inc., 610 F.Supp. at 289. As the United States Supreme Court has aptly reasoned:

> Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actors efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

Burger King Corp., 471 U.S. at 476.

Accordingly, Lucor's numerous purposeful contacts directed to Spectrum in Rhode Island via mail, e-mail, telephone, fax and wire, are sufficient to give rise to this Court's exercise of jurisdiction, notwithstanding the lack of Lucor's physical presence in Rhode Island. See id.; Brian Jackson & Co., 248 F.Supp.2d at 36 (finding "purposeful availment" where the defendant frequently corresponded with plaintiff in Rhode Island "by e-mail, facsimile transmission, and

telephone," some of which were initiated by plaintiff and some initiated by defendant); Dynamic Concepts, Inc., 610 F.Supp. at 289 ("[T]he mere lack of physical contacts cannot be determinative of whether jurisdiction may be exercised . . . ."). Lucor's longstanding business relationship with Spectrum, which lasted approximately two and one-half years and was filled with countless purposeful contacts directed into Rhode Island, clearly "evince[d] a voluntary decision by [Lucor] to interject [itself] into the local economy as a market participant." See Northeastern Land Svs., LTD., 988 F.Supp. at 58. See also Lantor, Inc., 2007 WL 204015, at *9 (finding voluntariness based on defendant's long term relationship with plaintiff).

Lucor's claims that it did not "knowingly and purposely direct its actions towards" Rhode Island and that its "only connection with Rhode Island is the unexpected and unilateral move by Spectrum to the state after formation of the Agreement," are disingenuous in the extreme. (Lucor's Memorandum, at 11, 12.) Contrary to Lucor's unsupported allegations, Lucor knew at the time that the Agreement was negotiated and executed that it was dealing with a Rhode Island company and that many of the services to be provided by Spectrum under the Agreement would be provided from Spectrum's Rhode Island offices. (See Lederman Aff., at ¶¶ 6-7, 11, 19-26.) For example, prior to execution of the contract, Lucor received e-mails from Spectrum containing a signature block which clearly indicated that Spectrum was located in Rhode Island. (Id. at ¶¶ 6-7.) Moreover, the very Agreement that forms the basis of this action identifies Spectrum's Rhode Island address and telephone number on the bottom of each and every page. (Id. at ¶ 11.)

Although Lucor represents to this Court that it believed that all of the services under the Agreement would be "provided at its principal place of business in North Carolina," (Lucor's Memorandum, at 12.), Lucor routinely directed e-mails and telephone calls to Spectrum in

Rhode Island asking it to perform various services under the Agreement from its Rhode Island office. (Lederman Aff., at ¶¶ 16-19.) It is telling that Lucor did not inform the Court of having sent four packages containing CDs to Spectrum in Rhode Island for Spectrum to use in providing its consulting services from its home office, without the need to travel to North Carolina to access that data on Lucor's own system. (Id. at ¶ 14.) Had Lucor actually intended that Spectrum would only perform its services in North Carolina, at Lucor's office, as Lucor now represents, those transmissions are inexplicable. In truth, it was undoubtedly foreseeable to Lucor, at the time of the Agreement's execution and throughout its performance, that it might be subject to the jurisdiction in Rhode Island if a dispute arose regarding the Agreement.

**C. This Court's Exercise of Jurisdiction Over Lucor Is Reasonable**

This Court's exercise of jurisdiction over Lucor is reasonable given the specific facts of this case. In making a reasonableness determination, the First Court considers five factors, which have been labeled as the "Gestalt Factors":

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interest of all sovereigns in promoting substantive social policies.

Pritzker v. Yari, 42 F.3d 53, 63-64 (1st Cir. 1994). As set out below, each of these Gestalt factors weighs in favor of this Court's exercise of jurisdiction over Lucor.

**1. Lucor has not demonstrated a special or unusual burden**

Lucor claims that its burden of appearing in Rhode Island is substantial because all of its employees, agents, and representatives with knowledge of the facts underlying this dispute, as well as all of its documents related to this matter, are located in North Carolina. (Lucor's Memorandum, at 13.) It is well-established, however, that a plaintiff's choice of forum in Rhode

Island is granted deference and the burden of defending a suit in Rhode Island is "only meaningful where a party can demonstrate some kind of special or unusual burden." Pritzker, 42 F.3d at 64. See also Nowak, 94 F.3d at 718; Lantor, Inc., 2007 WL 204015, at *10; Brian Jackson Co., 248 F.Supp. 2d at 37. There is nothing "special or unusual" about the burden that Lucor will face in defending this suit in Rhode Island. In fact, if, as Lucor requests, this case were to be litigated in North Carolina, Spectrum would face an identical burden because all of its employees, agents and representatives with knowledge of the facts underlying the dispute, and its relevant documents, are located in Rhode Island. (Lederman's Aff., at ¶ 29.) The fact that Lucor's alleged witnesses and documents are located in another state is not a sufficiently unique burden to defeat jurisdiction. See Brian Jackson Co., 248 F.Supp.2d at 37 (finding, even where all of defendant's witnesses and documents were located in Pennsylvania, that it did "not appear that the inconvenience to the Defendant is so severe as to overcome the deference due to Plaintiff's selection of forum"); Lantor, Inc., 2007 WL 204015, at *10 (finding that burden on Pennsylvania defendant of appearing in Rhode Island was not special or unusual); Northeastern Land Svs., LTD., 988 F.Supp. at 59 (finding that, although defendant resided in Texas, "[t]he distance which [defendant]must travel to defend this suit is not enough to render the exercise of jurisdiction [in Rhode Island] unreasonable").

**2. Rhode Island has an interest in adjudicating this dispute**

Despite Lucor's claims to the contrary, it is clear that Rhode Island has an interest in the resolution of this controversy. This Court has repeatedly held that Rhode Island has an interest in providing a forum to Rhode Island companies that have supplied goods or services to out-of-state defendants and have not received due compensation. See, e.g., Lantor, Inc., 2007 WL

204015, at *10; Microfibres, Inc., 2006 WL 305975, at *8; RI Hosp. Trust Nat'l Bank v. San Gabriel Hydroelectric P'ship, RHM, 667 F.Supp. 66, 72 (D.R.I. 1987).

In arguing that "Rhode Island has minimal interest in adjudicating this dispute," Lucor erroneously focuses on the fact that the Agreement contains a choice of law provision stating that the law of North Carolina will apply to controversies arising out of performance of the Agreement. That provision does not, however, establish that Rhode Island has no interest in protecting its own company, and certainly is not determinative of where personal jurisdiction lies. See RI Hosp. Trust Nat'l Bank, 667 F.Supp. at 70 (denying defendant's motion to dismiss for lack of personal jurisdiction, even though there was no choice of law provision contained in the contract at issue which "would suggest that [defendant] was purposefully directing its conduct towards Rhode Island" and holding that the "absence of such a provision is not determinative of the character of [defendant's] conduct"); Dynamic Concepts, Inc., 610 F.Supp. at 289 (finding that Rhode Island had personal jurisdiction over the defendant, even though the contract did not provide that the forum state's law would apply"). To hold, as Lucor requests, that a choice of law provision selecting another forum's law as controlling strips Rhode Island of jurisdiction would turn every choice of law provision into a mandatory forum selection provision, even though the parties never bargained for such a requirement. See Torco Oil Co. v. Innovative Thermal Corp., 730 F.Supp. 126, 132 (N.D. Ill. 1989) (quoting N. Trust Co. v. Randolph C. Dillon, Inc., 558 F.Supp. 1118, 1123 (N.D. Ill. 1983)) ("[T]he concept of choice-of-law is distinct from consent to personal jurisdiction, and it is quite conceivable that a choice-of-law provision might be included in a contract for reasons wholly unrelated to jurisdiction concerns . . . . While the parties may have expressed an intent to abide by the substantive law of one state, such a clause evidences no intent or agreement to be sued and to be forced to defend in

that same state."). See also Creative Socio-Medics, Corp. v. City of Richmond, 219 F.Supp.2d 300, 307 (E.D.N.Y. 2002) ("Choice of law provisions, as opposed to forum selection clauses, have minimal jurisdictional implications.") (internal quotations omitted).

**3. Spectrum will obtain more convenient and effective relief in Rhode Island**

It is obvious that it would be more convenient for Spectrum to litigate this case in Rhode Island, as opposed to North Carolina. Nevertheless, Lucor simply demands that this Court overlook the well-established rule that it must "accord plaintiff's choice of forum a degree of deference in respect to the issue of its own convenience." Lantor, Inc., 2007 WL 204015, at *11 (quoting Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994)). Lucor simply ducks the relevant issue by arguing that it would be more convenient for Spectrum to travel to litigate in North Carolina, that Lederman has traveled to North Carolina in the past, or even, as Lucor alleges, that Spectrum could obtain full relief in a North Carolina court. The fact remains that Spectrum, a Rhode Island company, has chosen to litigate this action in Rhode Island because it is the forum that would be most convenient from its perspective. See id.; Microfibres, Inc., 2006 WL 305975, at *8.

**4. A Rhode Island court can resolve this controversy just as effectively as a North Carolina court**

As Lucor concedes in its Memorandum, it is undisputed that this Court can resolve this controversy just as effectively as a North Carolina court. (Lucor's Memorandum, at 14.)

**5. The shared interest of the several states corresponds with Rhode Island's interests in this case**

All states have a substantive interest is ensuring that valid contracts, such as the Agreement at issue in this case, are not breached. In the instant case, Rhode Island has the greatest interest in enforcing the specific Agreement because "it is Rhode Island, rather than

some other state, that has lost business as a result of the alleged breach." RI Hosp. Trust Nat'l Bank, 667 F.Supp. at 72. In addition, contrary to Lucor's unsubstantiated claims, most of the underlying conduct took place in Rhode Island -- not North Carolina. (Lederman Aff. at ¶¶ 19-26.) The Agreement at issue was not executed in North Carolina and, although a few meetings between the parties did take place in North Carolina, many of Spectrum's services were performed -- at Lucor's request -- from Spectrum's offices in Rhode Island. (See Lederman's Aff., at ¶¶ 19, 26.) Accordingly, Rhode Island has the strongest interest in resolving this controversy and, consequently, it would not be unreasonable for this Court to exercise jurisdiction over Lucor. See RI Hosp. Trust Nat'l Bank, 667 F.Supp. at 72.

In sum, all of the Gestault factors weigh heavily in favor of the reasonableness of this Court exercising jurisdiction over Lucor. For these reasons, Lucor's Motion to Dismiss should be denied.

## II. The Court Should Deny Lucor's Motion to Dismiss for Improper Venue or, in the Alternative, to Transfer the Action to the Eastern District of North Carolina Because Venue in Rhode Island is Both Proper and Convenient

### A. Venue is Proper in Rhode Island

Lucor argues that the Court should dismiss this action pursuant to 28 U.S.C. § 1406(a) because venue does not lie in this district. (Lucor's Memorandum, at 15.) This statutory provision, which allows a court to dismiss or transfer a case filed in the wrong district, "is to be invoked when venue is *improper*, as opposed to merely *inconvenient*." D'Antuono v. CCH Computax Sys., Inc., 570 F.Supp. 708, 710 (D.R.I. 1983). See also 28 U.S.C § 1406(a) ("The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it would have been brought.")

There is not even a plausible argument in this case that venue in Rhode Island is improper. There is simply no basis to Lucor's claim that "[a]ll factors point toward North Carolina as an appropriate forum for this dispute to be heard." (Lucor's Memorandum, at 16.) Instead, the facts of this case unequivocally establish that venue in Rhode Island is proper under 28 U.S.C. § 1391(a)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in Rhode Island. As discussed more thoroughly above, the Agreement was largely negotiated via e-mails to and from Rhode Island, the Agreement was executed by Lucor's mailing of a signed copy into Rhode Island, and many of the services to be performed under the contract were performed at Spectrum's Rhode Island offices. (Lederman's Aff., at ¶¶ 6, 11, 19, 26.) Lucor's own conduct for approximately two and one-half years acknowledges that payment for Spectrum services was to be made in Rhode Island, and this case essentially arises out of the non-payment in Rhode Island for some of those services. Accordingly, contrary to Lucor's allegations, the events occurring in Rhode Island were substantial in nature and, consequently, venue in Rhode Island is proper under 28 U.S.C. § 1391(a). For this reason, the Court should deny Lucor's Motion to the extent that it seeks the dismissal and/or transfer of this action under 28 U.S.C. § 1406(a).

**B. Venue is Convenient in Rhode Island**

Lucor also argues that the Court should transfer this action to the Eastern District of North Carolina pursuant to 28 U.S.C. § 1404(a), which provides as follows:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought. 28 U.S.C. § 1404(a).

It is the general rule that a plaintiff's choice of forum is preferred unless there is a strong balance favoring the defendant's alternative forum choice. S.W. Indus., Inc. v. Aetna Cas. &

Surety Co., 653 F.Supp. 631, 637 (D.R.I. 1987). Mere inconvenience to the defendant is not sufficient to grant a transfer under § 1404(a) where this transfer would simply shift the inconvenience to the other party. Brian Jackson & Co., 248 F.Supp.2d at 38. Instead, "[t]he movant must make a *strong* showing that transfer of venue is appropriate under the circumstances." Id.

Lucor has not presented any evidence demonstrating that this action should be transferred to the Eastern District of North Carolina. Instead, Lucor relies upon the same misstatements that are cited throughout its Memorandum for the unsupported proposition that the Agreement at issue in this case was both executed and performed outside of Rhode Island. As set out above, this representation is contradicted by the contemporaneous e-mail records of the parties.

In addition, Lucor bases its motion to transfer on its unsubstantiated claim that a transfer to North Carolina would be more convenient. Lucor argues that the case should be transferred because all of its employees who have knowledge of the matters related to the Agreement, as well as all of its documents, are located in North Carolina. Lucor further argues that most depositions in this case will take place in North Carolina and Georgia because that is where the witnesses are located. Lucor does not identify what relevant witness are located in these alternative jurisdictions or specify their proposed testimony, but instead vaguely alludes to the inconvenience it will suffer if this case remains in Rhode Island. See Brian Jackson Co., 248 F.Supp.2d at 39 (refusing to transfer where defendant asserted that its witnesses and documents were not located in Rhode Island, but did not specify the relevant witnesses or their proposed testimony).

What Lucor's Memorandum ignores, however, is the fact that transferring this case to North Carolina will not eliminate this inconvenience, but will merely shift the inconvenience

from Lucor to Spectrum. See Brian Jackson Co., 248 F.Supp.2d at 38. All of Spectrum's employees and witnesses who have knowledge of the relevant facts, as well as all of Spectrum's documents, are located in Rhode Island. (Lederman's Aff., at ¶ 29.) In addition, upon information and belief, at least one of the possible third-party witnesses from GMAC, Rob Ells, and presumably his related GMAC documents, are also located in Rhode Island. (Id. at ¶ 28.) If this case was transferred to North Carolina, Spectrum would face the same inconvenience currently facing Lucor. Accordingly, Lucor has not made a strong showing that transfer is appropriate in this case, and has not overcome the deference granted to Spectrum's choice of forum. For these reasons, the Court should deny Lucor's Motion to the extent that it seeks a transfer of this case to the Eastern District of North Carolina.

## CONCLUSION

For the above reasons, the Court should deny Lucor's Motion to Dismiss for lack of personal jurisdiction, as well as Lucor's Motion to Dismiss for improper venue and Lucor's Motion to Transfer.

THE SPECTRUM CAPITAL GROUP, LLC

By its Attorneys,

/s/ Heather A. Pierce
Heather A. Pierce (#7345)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (Fax)
hpierce@eapdlaw.com

and

Steven M. Cowley (*pro hac vice*)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199-7613
(617) 239-0100
(617) 227-4420 (Fax)
scowley@eapdlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7th, 2007, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Heather A. Pierce