UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE SPECTRUM CAPITAL GROUP, LLC<br><br>Plaintiff,<br><br>v.<br><br>LUCOR, INC.<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 07-075ML |

**AFFIDAVIT OF MICHAEL G. LEDERMAN**

I, Michael G. Lederman, having been duly sworn, depose and say as follows:

1. I am currently the Managing Partner of The Spectrum Capital Group, LLC ("Spectrum"). I co-founded Spectrum in January 2000 and have been Managing Partner since that time. Since June 2004, Spectrum's sole place of business has been located at 471 Hope Street, Bristol, Rhode Island, 02809.

2. The matters set forth in this Affidavit are based upon my personal knowledge and my review of documents and communications related to Spectrum's relationship with Lucor, Inc. ("Lucor"). The information contained in this Affidavit is in addition to and in support of the information contained in Spectrum's Opposition to Lucor's Motion to Dismiss or, in the Alternative, to Transfer.

3. I was first contacted regarding Lucor by Don Draughon ("Draughon"), a financial advisor/investment banker who was, at that time, associated with a Virginia-based firm, and is also a former client of Spectrum's. On or around June 15, 2004, Draughon sent me an e-mail stating that he had a client, Stephen Conway ("Conway"), CEO of Lucor, that he wanted to discuss with me. At the time I received this email, I was in the process of moving my family, and Spectrum, from New Mexico back to Rhode Island. In fact, when I responded to

Draughon's e-mail the next day, on June 16, 2004, I was literally on the road traveling to Rhode Island. A true and accurate copy of my initial e-mail correspondence with Draughon regarding Lucor is attached hereto as Exhibit A.

4. Accordingly, at the time of my first contact with Conway, on or about June 16, 2004, I had already left New Mexico and was in the process of moving to Rhode Island. There were never any contacts between Spectrum and Lucor while Spectrum was located in New Mexico.

5. Following this initial contact with Conway, Spectrum and Lucor began negotiating an agreement pursuant to which Spectrum would act as Lucor's investment banker and financial advisor in connection with the restructuring of certain of Lucor's indebtedness being serviced by GMAC Commercial Mortgage ("GMAC") (the "Agreement").

6. Conway and I conducted negotiations regarding the Agreement via e-mail. Spectrum was located in Rhode Island at the time that these negotiations were taking place. That fact was made clear to Lucor, among other ways, because my e-mails to Lucor during these negotiations and related communications contained Spectrum's Rhode Island address in the signature block. Attached as Exhibit B is a true and accurate copy of an e-mail correspondence between Conway and me, dated July 15, 2004, regarding the fee arrangement to be included in the Agreement. That e-mail, among others, expressly notified Lucor of Spectrum's Rhode Island address.

7. Following these negotiations, I drafted an Agreement to be signed by Spectrum and Lucor. I drafted the Agreement in Spectrum's Rhode Island office and, in an e-mail dated July 24, 2004, sent the draft to Conway for his review. A true and accurate copy of this e-mail, as well as the draft Agreement that was attached, is attached hereto as Exhibit C. This e-mail to Conway was also sent with Spectrum's Rhode Island address in the signature block, providing

Lucor with further notice that it was about to enter into a contractual relationship with a Rhode Island company. In addition, the draft Agreement that was attached to the e-mail contained Spectrum's Rhode Island address in the footer at the bottom of each page.

8. On or about August 2, 2004, I traveled from Rhode Island to North Carolina. On August 3, 2004, I met with Conway to discuss the Agreement. During this meeting, I specifically recall discussing with Conway Spectrum's recent move to Rhode Island. I also distinctly remember telling Conway that I had traveled to North Carolina from Rhode Island. In fact, I remember discussing my move to Rhode Island with Conway because we are both boaters and I recall telling him how excited I was to be back near the water in Rhode Island. I left North Carolina on August 3, 2004.

9. Following my trip to North Carolina, Spectrum and Lucor continued to negotiate the terms of the Agreement. On August 4, 2004, I sent an e-mail to Conway attaching a new draft of the Agreement incorporating the changes that Conway and I had discussed during our meeting, and instructing Conway to return two executed copies of the Agreement to Spectrum, along with the August retainer. I further stated that I would then return a signed copy to Lucor. A true and accurate copy of my August 4, 2004 e-mail to Conway is attached hereto as Exhibit D. Although this e-mail contained a New Mexico address in the signature block, it was sent while Spectrum was located in Rhode Island. The inaccurate address was only the result of the fact that this e-mail was sent from my laptop, as opposed to the computer in my office, and I had not yet updated my laptop's automatic signature line for e-mails to reflect Spectrum's new Rhode Island address.

10. The negotiations between Spectrum and Lucor continued on August 5, 2004, when Conway e-mailed me to propose another change to the Agreement. A true and accurate copy of my August 5, 2004 e-mail correspondence with Conway is attached hereto as Exhibit E.

These e-mails illustrate that the Agreement between Spectrum and Lucor was not executed while I was in North Carolina.

11. Upon information and belief, the Agreement was thereafter executed pursuant to the language of my August 4, 2004 e-mail correspondence with Conway. The Agreement, as signed and returned by Lucor, was printed on Spectrum's letterhead and contained Spectrum's Rhode Island address at the bottom of each page.

12. On August 10, 2004, Spectrum received via mail from Lucor a check for $25,000, dated August 6, 2004, made payable to "The Spectrum Capital Group, 471 Hope Street, Bristol, RI 02809." This check was in payment of Lucor's first monthly fee pursuant to the Agreement and was mailed to Spectrum's Rhode Island address. A true and accurate copy of this check is attached hereto as Exhibit F.

13. Following this initial payment, Lucor has sent over thirty other checks to Spectrum in Rhode Island in payment of monthly fees and other expenses under the Agreement. The checks that Lucor has sent into Rhode Island have totaled more than $450,000. In addition, Spectrum received at least one payment from Lucor via wire transfer. Attached hereto as Exhibit G is a true and accurate copy of a record listing Spectrum's Lucor deposits between August 2004 and December 2006. Attached hereto as Exhibit H is a true and accurate copy of a record evidencing the wire transfer that Lucor wired to Spectrum via Fleet Bank in Bristol, Rhode Island on May 5, 2005.

14. In addition to these checks, Lucor also sent at least four overnight packages to Spectrum's Rhode Island offices. These packages contained CDs of Lucor's financial data to be analyzed by Spectrum at its Rhode Island office.

15. Similarly, Lucor has sent at least one fax to Spectrum in Rhode Island. A true and accurate copy of this fax, which was sent to Spectrum's Rhode Island fax number, is attached hereto as Exhibit I.

16. Spectrum has also received well over 100 substantive e-mails from Lucor throughout the performance of the Agreement. These e-mails were sent into Rhode Island by numerous individuals acting as representatives and agents of Lucor. The individuals sending e-mails to Spectrum in Rhode Island on behalf of Lucor included the following: Stephen Conway, CEO of Lucor; Jerry Conway, President of Lucor; Ken Carr ("Carr"), CFO of Lucor; John Northen, bankruptcy counsel retained by Lucor to advise it in connection with a potential bankruptcy filing and who frequently contacted Spectrum on behalf of Lucor to get Spectrum's advice and input on strategic and financial matters; Dick Hutson, another bankruptcy attorney who advised Lucor in connection with a potential bankruptcy filing and contacted Spectrum on behalf of Lucor regarding certain financial and strategic matters; and Jamie Clark, Lucor's corporate lawyer who contacted Spectrum on behalf of Lucor seeking Spectrum's input on financial corporate matters relating to the restructuring of Lucor's debt.

17. These representatives and agents of Lucor have also placed dozens, if not hundreds, of telephone calls to Spectrum in Rhode Island.

18. Many of these e-mails and telephone calls directed at Rhode Island were initiated by Lucor and its representatives and agents.

19. Spectrum performed services for Lucor from August 2004 through December 2006, and received monthly payments from Lucor throughout this time. Many of the services that Spectrum provided to Lucor pursuant to the Agreement were performed, not at Lucor's principal place of business, but in Spectrum's Rhode Island offices. In fact, following the execution of the Agreement, Lucor often sought advice and other services from Spectrum via

telephone or e-mail. In response to these requests, Spectrum routinely provided Lucor with advice and other services via telephone and e-mail. Attached hereto as Exhibits J through O are examples of the many e-mails sent by Lucor's representatives and agents seeking advice and other services from Spectrum in Rhode Island. These e-mails illustrate that Lucor asked Spectrum to perform services from Rhode Island throughout the relationship between the two companies.

20. Exhibit J contains a true and accurate copy of an e-mail from Conway to me, dated September 27, 2004, in which Conway asks for my advice relative to certain issues.

21. Attached as Exhibit K is a true and accurate copy of an e-mail from Carr to Joe Sands ("Sands"), a Partner at Spectrum. In this e-mail, dated April 13, 2005, Carr asks Sands to review an attached forecast and provide Carr with feedback regarding any changes that need to be made.

22. Exhibit L contains a true and accurate copy of an e-mail from Carr to Sands, dated May 10, 2005, in which Carr asks Sands to review an attached post-filing cash forecast and provide feedback relative to certain specified issues. Also contained in Exhibit L is the forwarded message that Sands sent to me discussing the fact that Carr wanted us to handle these issues from Rhode Island via telephone and e-mail. Exhibit L also contains the reply that Sands sent to Carr containing his responses to Carr's inquiries.

23. Attached as Exhibit M is a true and accurate copy of an e-mail that I sent to Conway, dated July 25, 2005, along with an attached advice memorandum that I prepared at Spectrum's offices in Rhode Island.

24. Exhibit N contains a true and accurate copy of an e-mail from Conway to me, dated December 6, 2005, in which Conway asks for my advice on his proposed approach to a certain situation.

25. Attached as Exhibit O is a true and accurate copy of an e-mail from Carr to me and Sands asking for assistance in the drafting of a paragraph discussing Lucor's restructuring. Exhibit O also contains the responses that we sent to Carr.

26. In addition to providing advice and other services directly to Lucor from Rhode Island, Spectrum also communicated with GMAC and other third parties from its Rhode Island offices as part of its efforts to restructure Lucor's debt. There were dozens of e-mails and telephone calls between Spectrum and these third-parties relative to the services that Spectrum was providing to Lucor pursuant to the Agreement. These e-mails and telephone calls included communications with the following: Conrad Nelson, GMAC's senior asset manager; Ron Ortel, Joel Holsinger, Krystal Black and Jennifer Price of Navigant Consulting, GMAC's financial advisors; employees of GE Capital, who Spectrum contacted at Lucor's request to discuss Lucor's indebtedness with GE Capital; and Charles Teitelbaum, legal counsel to Shell Oil Products US ("SOPUS"), who Spectrum communicated with via conference calls and e-mails regarding the restructuring of Lucor's trade obligations and equity positions held by SOPUS.

27. In addition to providing these services to Lucor in Rhode Island, the underlying debt that Spectrum was working to restructure for Lucor pursuant to the Agreement was located around the country, not solely in North Carolina or Georgia.

28. Upon information and belief, Lucor had contacts with Rhode Island regarding the restructuring of the debt that is the subject of the Agreement prior to its engagement of Spectrum. Upon information and belief, Rob Ells ("Ells"), the GMAC asset manager assigned to Lucor's case at the time that Spectrum came into contact with Lucor, was located in Rhode Island. The contact information that I have on file for Ells is 68 High Meadow Lane, Wakefield, Rhode Island. I have also called Ells at his home office in Rhode Island in connection with an unrelated matter. Upon information and belief, Lucor also contacted Ells at his home office in

Rhode Island regarding Lucor's debt being serviced by GMAC. In fact, I distinctly remember a conversation with Conway in which he remarked how odd it was that the person he was having trouble dealing with at GMAC, and the person he was hiring to help restructure the GMAC debt, were both located in Rhode Island.

29. All of Spectrum's records related to the Agreement are located in Rhode Island. In addition, all Spectrum employees, agents and representatives who have knowledge of the facts giving rise to this dispute are located in or near Rhode Island. It would be inconvenient for Spectrum to transport all of its records and witnesses to North Carolina.

FURTHER THE AFFIANT SAYETH NOT.

Signed and sworn to under the pains and penalties of perjury this 2nd day of May, 2007.

Michael G. Lederman

STATE OF RHODE ISLAND
COUNTY OF BRISTOL

In said County, on the 2ND day of May, 2007, before me personally appeared the above-named Michael G. Lederman, Managing Partner of The Spectrum Capital Group, LLC to me known and known by me to be the person executing the foregoing instrument, and he acknowledged said instrument by him so executed to be his free act and deed.

Notary Public
Print Name: **Margaret A. Stevens Notary Public**
My commission expires: **Commission Expires 9/9/08**

# Exhibit A

**From:** Mike Lederman
**Sent:** Wednesday, June 16, 2004 7:33 AM
**To:** Don Draughon
**Subject:** RE: Referral

...will do don. as it turns out, I'll be calling you from the Durham area as I'm visiting my brother in Holly Springs with the family as part of our cross-country trek back to RI from whence we moved to NM. It's still too early to call, so if you get this before I call, just dial me up on my cell -- 505.228.2628.

Michael G. Lederman
Managing Partner
The Spectrum Capital Group, LLC
320 Gold SW
Albuquerque, NM 87102
v: 505.244.0244
f: 505.244.0184
c: 505.228.2628
mgl@spectrumcapitalgroup.com
www.spectrumcapitalgroup.com

---

**From:** Don Draughon [mailto:dond@vintagecapital.net]
**Sent:** Tue 6/15/2004 11:57 PM
**To:** Mike Lederman
**Subject:** Referral

Mike I have a client that we could worked together on that I wish to discuss with you. His name is Steve Conway at Lucor, Inc. a 220 store Jiffy Lube operator that has most his debt with GMAC (the old EMAC). Please call me at (919) 608-0790 Wednesday to discuss. I would like to work together on this if you would entertain the idea.

Also I gave Kevin Fechtmeyer one of the former partners of the Shattan group your telephone number as he is moving to Arizona.

Hope you and your family are doing well.

Don

# Exhibit B

---

**From:** Mike Lederman
**Sent:** Thursday, July 15, 2004 12:50 PM
**To:** 'Conway, Steve'
**Subject:** Engagement Matters

Steve --

I understand your perspective and I hope you'll understand mine.

I have found that the "success" I am able to help achieve with my clients and the value derived therefrom results more from the strategies, insights and analyses that I strive to bring to bear in a particular situation than anything else. As important as hard work and perseverence [e.g., long hours] may be in a particular situation, it is the creativity that goes into developing a strategy and setting a tactical course that makes the difference between a huge success vs. wasting time and money. Hence, an hourly fee basis generally does not work for me. And reduced hourly fees really don't do it.

I don't want you to feel like you're taking a flyer with us and limiting your downside. I would not be comfortable proceeding if that were your perspective. Instead, I would like you to feel that you're filling in your team with the kind of players you feel you need to achieve the success you're looking for and need here.

I've spent most of this morning fleshing out our litigation theory and I'm very happy with the result,

particularly in comparison to the Moore & Van Allen complaint. I should finish within a couple of hours and I am really looking forward to sharing the work with you. Soon after our visit on 8/3, I think we'll be able to put together the "imminency of default" theory and strategy. With that and the litigation theory we will be in a position to approach Gary Marsh, GMAC's de facto outside general counsel with the goal of engaging him and GMAC in substantive negotiations that lead to a successful resolution. And I'm hopeful that a successful resolution of the matters we're talking about confronting together will open the gates for a whole bunch of transactional work that's been stymied by the status quo.

To try to accomodate both of our perspectives, I would suggest the following: After three months of retainers at the $25,000 level, the retainer would drop to $10,000/month with the full amount creditable against success fees. This will lower your up front costs and align SCG's compensation with your goals, while recognizing the value of the work we'll be providing at this all-important stage.

I have given a bit more thought to what "success" would be in this matter, and based on your comment below it appears you have as well. Let's see if we can come to terms on the initial phase of the engagement and then turn to this topic.

Michael G. Lederman
Managing Partner
The Spectrum Capital Group, LLC
471 Hope Street
Bristol, Rhode Island 02809
v: 401.396.9777
f: 401.396.9781
mgl@spectrumcapitalgroup.com
www.spectrumcapitalgroup.com

---

**From:** Conway, Steve [mailto:Steve.Conway@TeamLucor.com]
**Sent:** Thursday, July 15, 2004 11:54 AM
**To:** Mike Lederman
**Subject:** RE: Lucor Strategy -- Misc.

Mike, I generally don't like retainers. We can work hourly however,there has to be some kind of incentive to get this settled in as short a period of time as possible. I am not interested in spending $50,000/Month in advisory fees and legal fees for 6 months and ending up with nothing. I have already spent too much time and money on these GMAC assholes. It seems to me there is a two step process.
1. You need to spend the time to get enough due diligence to come up with a specific game plan. We seem to be on our way there now. Since your group is new to us at this point, I would suggest we engage you on an hourly basis at a reduced percentage.
2. After you have everything researched and present an action plan. Then we go either on straight full hourly or at that point we enter into an incentive compensation plan. We could define success in a number of ways.
In any case, I want your compensation aligned with our goals and results.I prefer fees tied to success with lower up front costs.
What do you think?
Steve

-----Original Message-----
**From:** Mike Lederman [mailto:MGL@spectrumcapitalgroup.com]
**Sent:** Thursday, July 15, 2004 9:06 AM
**To:** Steve.Conway@TeamLucor.com

**Subject:** Lucor Strategy -- Misc.

Steve --

Just a few follow-up items:

* I'm re-reading the Oryx complaint concentrating on the perspective that it is an action for fraud by EMAC perpetrated against note buyers. I'm finding interesting parallels indicating that the fraud was equally perpetrated against the issuers (you and others) and that GMAC's role is one of continuing to perpetrate [service] the fraud. More on this later...

* I've thought of two litigators that you might want to speak to in addition to those you know. I've used both before and know they can do the job. After we've developed our theories a little further, let me know if you're interested in speaking to either of them. At this stage, I have no idea of their availability.

* I'm hoping to get a draft of the engagement letter to you over the weekend or on Monday. I looked back at my last litigation/expert witness-oriented engagement which began Q4'02. I billed out at $525/hr., my partner, Joe Sands, at $375/hr., VP's at $300/hr and Associates at $250/hr. In this matter, my guess is that more than 90% of the time billed would be by Joe and me. Our blended rate is $450/hr., implying a break-even of 56 hours/month vs. an ongoing retainer of $25,000/month. I would expect that over a several month period the hourly rate would be modestly more costly to you. However, I would prefer a monthly retainer arrangement of $25,000. It's your call thought, so let me know and I'll draft the letter accordingly.

Talk to you soon.

Michael G. Lederman
Managing Partner
The Spectrum Capital Group, LLC
471 Hope Street
Bristol, Rhode Island 02809
v: 401.396.9777
f: 401.396.9781
mgl@spectrumcapitalgroup.com
www.spectrumcapitalgroup.com

# Exhibit C

-----Original Message-----
From: Mike Lederman
Sent: Saturday, July 24, 2004 1:29 PM
To: Steve.Conway@TeamLucor.com
Cc: Joe Sands
Subject: Engagement

Steve --

Sorry for the delay getting this to you. We had some underbrush that had to be cleared but we're good to go now.

I've spoken with Tom Fitzpatrick, a litigation partner at Davis Molm in Boston, whom I'd highly recommend for the effort we are contemplating undertaking. Tom seemed to like Lucor's case and is interested in assisting. He's running a conflict check now before we provide additional information. I'd suggest we try to set up a conference call with him sometime this coming week so you can take a read on him.

I've invited my partner, Joe Sands, to join us for the meeting at your offices on August 3rd. Joe's familiarity with franchise lending and financial modeling will be helpful as we analyze the imminent default theory.

Talk to you soon.

Michael G. Lederman
Managing Partner
The Spectrum Capital Group, LLC
471 Hope Street
Bristol, Rhode Island 02809
v: 401.396.9777
f: 401.396.9781

c: 505.228.2628
mgl@spectrumcapitalgroup.com
www.spectrumcapitalgroup.com

<<LucorEngLtr.doc>>

**THE SPECTRUM CAPITAL GROUP LLC**
***Investment and Merchant Bankers***

August 1, 2004

Mr. Stephen P. Conway
CEO
Lucor, Inc.
Raleigh, NC

Dear Stephen:

This letter (the "Agreement") will confirm the understanding and agreement between Lucor, Inc., and its subsidiaries and affiliates (together "Lucor" or the "Company") and The Spectrum Capital Group, LLC ("SCG"), regarding the scope and terms of the retention of SCG as the Company's exclusive investment bankers and financial advisors in connection with the matters set forth below in Section 1 of the Agreement.

Section 1. Services to be Rendered. SCG will perform such services as the Company may request including, but not limited to, the following:

a) SCG will assist Lucor in devising and assessing alternative financial strategies for its business;

b) SCG will review and analyze the business plans and financial projections prepared by the Company including but not limited to testing assumptions and comparing those assumptions with historical Company and industry trends;

c) SCG will assist the Company and its other professionals in formulating and negotiating an out-of-court plan to restructure Lucor's indebtedness being serviced by GMAC Commercial Mortgage ("GMAC");

d) SCG will advise the Company as to its debt capacity in connection with its restructuring;

e) SCG will advise the Company and participate in negotiations in connection with one or more possible transactions to re-finance Lucor's indebtedness being serviced by GMAC;

f) Should any litigation between the Company and GMAC ensue from the Company's attempts to restructure and re-finance Lucor's indebtedness being serviced by GMAC, SCG shall advise the Company as to the financial implications of such litigation; and

*471 Hope Street, Bristol, Rhode Island 02908 Tel. 401.396.9777*

g) SCG will render such other financial advisory and investment banking services as may be agreed upon by SCG and the Company in connection with the foregoing.

In rendering services to Lucor hereunder, SCG is not assuming any responsibility for the Company's decision to effect or not effect any transaction.

Section 2. Information Provided by the Company. The Company will furnish SCG with such information as SCG and the Company agrees is appropriate to enable SCG to render services hereunder (all such information being the "Information"). The Company recognizes and confirms that SCG (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having assumed any obligation to independently verify the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, and (c) will not act in the official capacity of an appraiser of specific assets of the Company or any other party. The Company confirms that the Information to be furnished by the Company, when delivered, will be true and correct in all material respects, will be prepared in good faith, and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contain therein not misleading. The Company will promptly notify SCG if it learns of any material inaccuracy or misstatement in, or material omission from, any information theretofore delivered to SCG.

Section 3. Fees. As compensation for the services rendered hereunder, the Company, and its successors, if any, agrees to pay SCG (via wire transfer or other mutually acceptable means) the following fees in cash:

a) A monthly cash advisory fee (the "Monthly Fee") equal to $25,000 per month for a minimum of three months. After six months, the Monthly Fee shall be reduced to $15,000. Monthly Fees paid after the first anniversary of this Agreement shall be applied as a credit to any amounts that may become due to SCG under Sections 3(b) and (c) hereof. The Monthly Fee shall be payable in advance on the monthly anniversary date of this Agreement.

b) A minimum restructuring or reorganization fee (the "Reorganization Fee") equal to $750,000 (seven hundred fifty thousand dollars) provided that the Company successfully completes an out-of-court restructuring of the Company's indebtedness being serviced by GMAC. An out-of-court restructuring shall be defined as a refinancing or consensual modification of the original loan terms and/or conditions including but not limited to a material change in any of the following items: principal due, remaining term, interest rate, financial covenants or collateral on any loan obligation currently serviced by GMAC.

c) A re-financing fee (the "Financing Fee") of 1.00% of the commitment made by the Company's lender(s) to a re-financing of Lucor's indebtedness being serviced by GMAC and accepted by the Company, but not less than $250,000. Additional Financing

Fees shall be negotiated between SCG and the Company if SCG is requested to arrange any additional financing for Lucor.

Section 4. Expenses. Without in any way reducing or affecting the provisions of Exhibit A hereto, Lucor shall reimburse SCG for its reasonable out-of-pocket expenses incurred in connection with the provision of services hereunder; provided, however, SCG shall not incur expenses in excess of $5,000 during any calendar month without first having obtained the Company's approval. Out-of-pocket expenses also shall include, but not be limited to, travel and lodging, research and courier services. As a matter of practice, SCG does not seek reimbursement for staff overtime, copying, fax, telephone and like charges unless such charges are extraordinary. The Company shall promptly reimburse SCG upon presentation of an invoice or similar documentation.

Section 5. Indemnity. The Company agrees to the provisions of Exhibit A hereto which provide for certain indemnification by the Company of SCG and certain related persons. Such indemnification is an integral part of this Agreement and the terms thereof are incorporated by reference herein. Such indemnification shall survive any termination, expiration or completion of SCG's engagement hereunder.

Section 6. Term. The term of SCG's engagement shall extend from the date hereof through the date the Company consummates an out-of-court restructuring; provided, however, that either the Company or SCG can cancel this Agreement by providing notice in writing (the "Term"); provided further, however, that in the event SCG cancels this Agreement, it shall not be entitled to receive any further fees hereunder from the date of cancellation forward, other than any fees payable pursuant to the last sentence of this paragraph; and provided further, however, that except in the event of gross negligence or willful misconduct by SCG, the Company may not cancel this Agreement prior to the expiration of a three-month period from the date hereof, and then, only upon providing thirty (30) days advance notice in writing. If terminated, SCG shall be entitled to any fees for any monthly period that are due and owing to SCG upon the effective date of termination; provided, however, such amounts will be pro-rated for any incomplete monthly period of service, and SCG will be entitled to the reimbursement for the out-of-pocket expenses described in Section 4. Termination of the Agreement hereunder shall not affect or impair the Company's continuing obligation to indemnify SCG and certain related persons as provided in Exhibit A and its continuing obligations under Section 7 hereof. Without limiting the foregoing, compensation shall be payable under Section 3(b) or (c) above in the event that a restructuring or re-financing transaction is consummated at any time prior to the expiration of eighteen months after such termination, or a letter of intent or definitive agreement with respect to a Reorganization or Transaction is executed at any time prior to eighteen months after such termination (which letter of intent or definitive agreement subsequently results in the consummation of a restructuring or re-financing transaction at any time), (y) as to which SCG advised the Company hereunder prior to the termination of this Agreement, or (z) which involves a party identified to the Company by SCG or with whom the Company had discussions regarding a restructuring.

Section 7. Miscellaneous.

a) Sections 2 through 7 shall survive termination or expiration of the Agreement.

b) SCG shall be under no obligation to provide formal fairness, valuation or solvency opinions (except to the extent valuation opinions are embodied in testimony) with respect to any of the proceedings or transactions contemplated hereby or incidental hereto. However, SCG and its affiliates shall be provided the option to do so where such opinions are necessary and are appropriate. The terms of such engagement shall be customary for such services rendered by investment banking firms at the time of the engagement and shall be subject to one or more separate agreements between the Company and SCG.

c) The advice (oral or written) rendered by SCG pursuant to this Agreement is intended solely for the benefit and use of the Company and its professionals in considering the matters to which this Agreement relates, and the Company agrees that such advice may not be relied upon by any other person, used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose, nor shall any public references to SCG be made by the Company, without the prior written consent of SCG.

d) The Company agrees that SCG shall have the right upon engagement and after completion of each Transaction to place advertisements in financial and other newspapers and journals at its own expense describing its investment and merchant banking services hereunder. SCG shall submit such advertisements in advance to the Company for its approval, which shall not be withheld unreasonably, relative to the content and timing of such advertisements.

d) This Agreement may not be amended or modified except by a writing executed by each of the parties and this Agreement, including all controversies arising from or relating to performance under this Agreement, shall, be governed by and construed in accordance with the laws of the State of North Carolina, without giving effect to such state's rules concerning conflicts of law. The provisions of this Agreement, including, without limitation, the obligation to make the payments set forth in Sections 3, 4 and 5, shall be binding on the Company and its successors and assigns.

i) The relationship of SCG to the Company hereunder shall be that of an independent contractor and SCG shall have no authority to bind, represent or otherwise act as agent for the Company.

We very much look forward to assisting Lucor in this most important endeavor. If the foregoing correctly sets forth the understanding and agreement between SCG and the Company, please so indicate by signing the enclosed copy of this letter, whereupon it shall become a binding agreement between the parties hereto as of the date first above written.

Very truly yours,

THE SPECTRUM CAPITAL GROUP, LLC

By: ____________________
Michael G. Lederman
Managing Partner

Accepted and Agreed to as of
The day first written above:

LUCOR, INC.

By: ____________________
Stephen P. Conway
CEO

**Exhibit A**

The Company shall defend, indemnify and hold harmless SCG and its partners, affiliates, counsel and other professional advisors, and the respective directors, officers, controlling persons, agents and employees of each of the foregoing (SCG and all of such other persons collectively, the "Indemnified Parties"), from and against any losses, claims or proceedings including stockholder actions, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards, other liabilities, costs, fees and expenses (collectively, "Losses") (i) related to or arising out of (A) oral or written information provided by the Company, the Company's employees or other agents, which either the Company or SCG provides to any persons, or (B) other action or failure to act by the Company, the Company's employees or other agents or SCG at the Company's request or with the Company's consent, or (ii) otherwise related to or arising out of the engagement of SCG under this Agreement or any transaction or conduct in connection therewith, provided that this clause (ii) shall not apply to the extent it is finally judicially determined by a court of competent jurisdiction that such Losses arose out of the gross negligence or bad faith of such Indemnified Party. If multiple claims are brought against an Indemnified Party in an arbitration, with respect to at least one of which indemnification is permitted under applicable law and provided for under this Agreement, the Company agrees that any arbitration award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for, except to the extent the arbitration award expressly states that the award, or any portion thereof, is based on a claim as to which indemnification is not available.

The Company shall further reimburse any Indemnified Party promptly for, or at the Indemnified Party's option advance amounts sufficient to cover, any legal or other fees or expenses as they are incurred (i) in investigating, preparing or pursuing any action or other proceeding (whether formal or informal) or threat thereof, whether or not in connection with pending or threatened litigation or arbitration and whether or not any Indemnified Party is a party (an "Action") and (ii) in connection with enforcing such Indemnified Party's rights under this Agreement (including, without limitation, its rights under this Exhibit A; provided, however, that to the extent it is finally judicially determined by a court of competent jurisdiction that the Losses of such Indemnified Party arose out of the gross negligence or bad faith of such Indemnified Party, such Indemnified Party will promptly remit to the Company any amounts reimbursed or advanced under this paragraph.

The Company shall assume the defense of any such Action including the employment of counsel reasonably satisfactory to SCG and will not settle, compromise, consent or otherwise resolve or seek to terminate any pending or threatened Action (whether or not any Indemnified Part is a party thereto) unless it obtains the prior written consent of SCG an express, unconditional release of each Indemnified Party from all liability relating to such Action and the engagement of SCG under this Agreement. Any Indemnified Party shall be entitled to retain separate counsel of its choice and participate in the defense of any Action in connection with any of the matters to which this Exhibit A relates, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless: (i) the Company has failed promptly to assume the defense and employ counsel or (ii) the named parties to any such Action (including any impleaded parties) include such Indemnified Party and the Company, and such Indemnified Person shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Company; provided that the Company shall not in such event be responsible under this Exhibit A for the fees and expenses of more than one firm of separate counsel ( in addition to local counsel) in connection with any such Action in the same jurisdiction.

The Company agrees that if any right of any Indemnified Party set forth in the preceding paragraphs is finally judicially determined to be unavailable (except by reason of the gross negligence or bad faith of such Indemnified Party), or is insufficient to hold such Indemnified Party harmless against such Losses as contemplated herein, then the Company shall contribute to such Losses (i) in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and such Indemnified Party, on the other hand, in connection with the transactions contemplated hereby, and (ii) if (and only if) the allocation provided in clause (i) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Company and such Indemnified Party; provided, however, that in no event shall the amount, if any, to be contributed by all Indemnified Parties exceed the amount of the fees actually received by SCG hereunder. Benefits received (or anticipated to be received) by the Company shall be deemed to be equal to the aggregate cash consideration and value of securities or any other property payable, exchangeable or transferable in any proposed or potential transactions within the scope of this Agreement, and benefits received by SCG shall be deemed to be equal to the compensation payable by the Company to SCG in connection with this Agreement. Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct related to information provided by the Company or other conduct by the Company (or the Company's employees or other agents) on the one hand or by SCG on the other hand. The parties agree that it would not be just and equitable if contribution were determined by pro rata allocation or by any other method of allocation which does not take into account the equitable considerations referred to above.

The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with advice or services rendered or to be rendered by any Indemnified Party pursuant to this Agreement, the transactions contemplated hereby or any Indemnified Party's actions or inactions in connection with any such advice, services or transactions except for Losses of the Company that are finally judicially determined by a court of competent jurisdiction to have arisen out of the gross negligence or bad faith of such Indemnified Party in connection with any such advice, actions, inactions or services.

The rights of the Indemnified Parties hereunder shall be in addition to any other rights that any Indemnified Party may have at common law, by statute or otherwise. Except as otherwise expressly provided for in this Exhibit A, if any term, provision, covenant or restriction contained in this Exhibit A is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement all remain in full force and effect and shall in no way be affected, impaired or invalidated. The reimbursement, indemnity and contribution obligations of the Company set forth herein shall apply to any modification of this Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Person's services under or in connection with, this Agreement.

# Exhibit D

**From:** Mike Lederman
**Sent:** Wednesday, August 04, 2004 7:30 AM
**To:** Steve.Conway@TeamLucor.com
**Cc:** Joe Sands
**Subject:** Lucor

Steve --

That was a good meeting yesterday and I enjoyed meeting you.

I've attached the engagement letter with the changes we discussed. If you would return two executed copies to me via FedEx together with the August retainer, I'll return a signed copy to you and we'll get going together in earnest.

In that regard, please let Ken know that I'll be introducing him by telephone to my partner, Joe Sands, this week to begin the re-underwriting/analytical part of the process.

Talk to you soon.

Michael G. Lederman
Managing Partner

The Spectrum Capital Group, LLC
320 Gold SW
Albuquerque, NM 87102
v: 505.244.0244
f: 505.244.0184
c: 505.228.2628
mgl@spectrumcapitalgroup.com
www.spectrumcapitalgroup.com

THE SPECTRUM CAPITAL GROUP LLC
*Investment and Merchant Bankers*

August 1, 2004

Mr. Stephen P. Conway
CEO
Lucor, Inc.
Raleigh, NC

Dear Stephen:

This letter (the "Agreement") will confirm the understanding and agreement between Lucor, Inc., and its subsidiaries and affiliates (together "Lucor" or the "Company") and The Spectrum Capital Group, LLC ("SCG"), regarding the scope and terms of the retention of SCG as the Company's exclusive investment bankers and financial advisors in connection with the matters set forth below in Section 1 of the Agreement.

Section 1. Services to be Rendered. SCG will perform such services as the Company may request including, but not limited to, the following:

a) SCG will assist Lucor in devising and assessing alternative financial strategies for its business;

b) SCG will review and analyze the business plans and financial projections prepared by the Company including but not limited to testing assumptions and comparing those assumptions with historical Company and industry trends;

c) SCG will assist the Company and its other professionals in formulating and negotiating an out-of-court plan to restructure Lucor's indebtedness being serviced by GMAC Commercial Mortgage ("GMAC");

d) SCG will advise the Company as to its debt capacity in connection with its restructuring;

e) SCG will advise the Company and participate in negotiations in connection with one or more possible transactions to re-finance Lucor's indebtedness being serviced by GMAC;

f) Should any litigation between the Company and GMAC ensue from the Company's attempts to restructure and re-finance Lucor's indebtedness being serviced by GMAC, SCG shall advise the Company as to the financial implications of such litigation; and

g) SCG will render such other financial advisory and investment banking services as may be agreed upon by SCG and the Company in connection with the foregoing.

In rendering services to Lucor hereunder, SCG is not assuming any responsibility for the Company's decision to effect or not effect any transaction.

Section 2. Information Provided by the Company. The Company will furnish SCG with such information as SCG and the Company agrees is appropriate to enable SCG to render services hereunder (all such information being the "Information"). The Company recognizes and confirms that SCG (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having assumed any obligation to independently verify the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, and (c) will not act in the official capacity of an appraiser of specific assets of the Company or any other party. The Company confirms that the Information to be furnished by the Company, when delivered, will be true and correct in all material respects, will be prepared in good faith, and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contain therein not misleading. The Company will promptly notify SCG if it learns of any material inaccuracy or misstatement in, or material omission from, any information theretofore delivered to SCG.

Section 3. Fees. As compensation for the services rendered hereunder, the Company, and its successors, if any, agrees to pay SCG (via wire transfer or other mutually acceptable means) the following fees in cash:

a) A monthly cash advisory fee (the "Monthly Fee") equal to $25,000 per month for a minimum of three months. After six months, the Monthly Fee shall be reduced to $15,000. Monthly Fees paid after the first anniversary of this Agreement shall be applied as a credit to any amounts that may become due to SCG under Sections 3(b) and (c) hereof. The Monthly Fee shall be payable in advance on the monthly anniversary date of this Agreement.

b) A minimum restructuring or reorganization fee (the "Reorganization Fee") equal to $750,000 (seven hundred fifty thousand dollars) provided that the Company successfully completes an out-of-court restructuring of the Company's indebtedness being serviced by GMAC. An out-of-court restructuring shall be defined as a refinancing or consensual modification of the original loan terms and/or conditions including but not limited to a material change in any of the following items: principal due, remaining term, interest rate, financial covenants or collateral on any loan obligation currently serviced by GMAC.

c) A re-financing fee (the "Financing Fee") of 1.00% of the commitment made by the Company's lender(s) to a re-financing of Lucor's indebtedness being serviced by GMAC and accepted by the Company, but not less than $250,000. Additional Financing

Fees shall be negotiated between SCG and the Company if SCG is requested to arrange any additional financing for Lucor.

Section 4. Expenses. Without in any way reducing or affecting the provisions of Exhibit A hereto, Lucor shall reimburse SCG for its reasonable out-of-pocket expenses incurred in connection with the provision of services hereunder; provided, however, SCG shall not incur expenses in excess of $5,000 during any calendar month without first having obtained the Company's approval. Out-of-pocket expenses also shall include, but not be limited to, travel and lodging, research and courier services. As a matter of practice, SCG does not seek reimbursement for staff overtime, copying, fax, telephone and like charges unless such charges are extraordinary. The Company shall promptly reimburse SCG upon presentation of an invoice or similar documentation.

Section 5. Indemnity. The Company agrees to the provisions of Exhibit A hereto which provide for certain indemnification by the Company of SCG and certain related persons. Such indemnification is an integral part of this Agreement and the terms thereof are incorporated by reference herein. Such indemnification shall survive any termination, expiration or completion of SCG's engagement hereunder.

Section 6. Term. The term of SCG's engagement shall extend from the date hereof through the date the Company consummates an out-of-court restructuring; provided, however, that either the Company or SCG can cancel this Agreement by providing notice in writing (the "Term"); provided further, however, that in the event SCG cancels this Agreement, it shall not be entitled to receive any further fees hereunder from the date of cancellation forward, other than any fees payable pursuant to the last sentence of this paragraph; and provided further, however, that except in the event of gross negligence or willful misconduct by SCG, the Company may not cancel this Agreement prior to the expiration of a three-month period from the date hereof, and then, only upon providing thirty (30) days advance notice in writing. If terminated, SCG shall be entitled to any fees for any monthly period that are due and owing to SCG upon the effective date of termination; provided, however, such amounts will be pro-rated for any incomplete monthly period of service, and SCG will be entitled to the reimbursement for the out-of-pocket expenses described in Section 4. Termination of the Agreement hereunder shall not affect or impair the Company's continuing obligation to indemnify SCG and certain related persons as provided in Exhibit A and its continuing obligations under Section 7 hereof. Without limiting the foregoing, compensation shall be payable under Section 3(b) or (c) above in the event that a restructuring or re-financing transaction is consummated at any time prior to the expiration of eighteen months after such termination, or a letter of intent or definitive agreement with respect to a Reorganization or Transaction is executed at any time prior to eighteen months after such termination (which letter of intent or definitive agreement subsequently results in the consummation of a restructuring or re-financing transaction at any time), (y) as to which SCG provided material advice to the Company hereunder prior to the termination of this Agreement, or (z) which involves a party identified to the Company by SCG or with whom the Company had material discussions regarding a restructuring.

Section 7. Miscellaneous.

a) Sections 2 through 7 shall survive termination or expiration of the Agreement.

b) SCG shall be under no obligation to provide formal fairness, valuation or solvency opinions (except to the extent valuation opinions are embodied in testimony) with respect to any of the proceedings or transactions contemplated hereby or incidental hereto. However, SCG and its affiliates shall be provided the option to do so where such opinions are necessary and are appropriate. The terms of such engagement shall be customary for such services rendered by investment banking firms at the time of the engagement and shall be subject to one or more separate agreements between the Company and SCG.

c) The advice (oral or written) rendered by SCG pursuant to this Agreement is intended solely for the benefit and use of the Company and its professionals in considering the matters to which this Agreement relates, and the Company agrees that such advice may not be relied upon by any other person, used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose, nor shall any public references to SCG be made by the Company, without the prior written consent of SCG.

d) The Company agrees that SCG shall have the right upon engagement and after completion of each Transaction to place advertisements in financial and other newspapers and journals at its own expense describing its investment and merchant banking services hereunder. SCG shall submit such advertisements in advance to the Company for its approval, which shall not be withheld unreasonably, relative to the content and timing of such advertisements.

d) This Agreement may not be amended or modified except by a writing executed by each of the parties and this Agreement, including all controversies arising from or relating to performance under this Agreement, shall, be governed by and construed in accordance with the laws of the State of North Carolina, without giving effect to such state's rules concerning conflicts of law. The provisions of this Agreement, including, without limitation, the obligation to make the payments set forth in Sections 3, 4 and 5, shall be binding on the Company and its successors and assigns.

i) The relationship of SCG to the Company hereunder shall be that of an independent contractor and SCG shall have no authority to bind, represent or otherwise act as agent for the Company.

We very much look forward to assisting Lucor in this most important endeavor. If the foregoing correctly sets forth the understanding and agreement between SCG and the Company, please so indicate by signing the enclosed copy of this letter, whereupon it shall become a binding agreement between the parties hereto as of the date first above written.

Very truly yours,

THE SPECTRUM CAPITAL GROUP, LLC

By: ______________________
Michael G. Lederman
Managing Partner

Accepted and Agreed to as of
The day first written above:

LUCOR, INC.

By: ______________________
Stephen P. Conway
CEO

**Exhibit A**

The Company shall defend, indemnify and hold harmless SCG and its partners, affiliates, counsel and other professional advisors, and the respective directors, officers, controlling persons, agents and employees of each of the foregoing (SCG and all of such other persons collectively, the "Indemnified Parties"), from and against any losses, claims or proceedings including stockholder actions, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards, other liabilities, costs, fees and expenses (collectively, "Losses") (i) related to or arising out of (A) oral or written information provided by the Company, the Company's employees or other agents, which either the Company or SCG provides to any persons, or (B) other action or failure to act by the Company, the Company's employees or other agents or SCG at the Company's request or with the Company's consent, or (ii) otherwise related to or arising out of the engagement of SCG under this Agreement or any transaction or conduct in connection therewith, provided that this clause (ii) shall not apply to the extent it is finally judicially determined by a court of competent jurisdiction that such Losses arose out of the gross negligence or bad faith of such Indemnified Party. If multiple claims are brought against an Indemnified Party in an arbitration, with respect to at least one of which indemnification is permitted under applicable law and provided for under this Agreement, the Company agrees that any arbitration award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for, except to the extent the arbitration award expressly states that the award, or any portion thereof, is based on a claim as to which indemnification is not available.

The Company shall further reimburse any Indemnified Party promptly for, or at the Indemnified Party's option advance amounts sufficient to cover, any legal or other fees or expenses as they are incurred (i) in investigating, preparing or pursuing any action or other proceeding (whether formal or informal) or threat thereof, whether or not in connection with pending or threatened litigation or arbitration and whether or not any Indemnified Party is a party (an "Action") and (ii) in connection with enforcing such Indemnified Party's rights under this Agreement (including, without limitation, its rights under this Exhibit A; provided, however, that to the extent it is finally judicially determined by a court of competent jurisdiction that the Losses of such Indemnified Party arose out of the gross negligence or bad faith of such Indemnified Party, such Indemnified Party will promptly remit to the Company any amounts reimbursed or advanced under this paragraph.

The Company shall assume the defense of any such Action including the employment of counsel reasonably satisfactory to SCG and will not settle, compromise, consent or otherwise resolve or seek to terminate any pending or threatened Action (whether or not any Indemnified Part is a party thereto) unless it obtains the prior written consent of SCG an express, unconditional release of each Indemnified Party from all liability relating to such Action and the engagement of SCG under this Agreement. Any Indemnified Party shall be entitled to retain separate counsel of its choice and participate in the defense of any Action in connection with any of the matters to which this Exhibit A relates, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless: (i) the Company has failed promptly to assume the defense and employ counsel or (ii) the named parties to any such Action (including any impleaded parties) include such Indemnified Party and the Company, and such Indemnified Person shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Company; provided that the Company shall not in such event be responsible under this Exhibit A for the fees and expenses of more than one firm of separate counsel ( in addition to local counsel) in connection with any such Action in the same jurisdiction.

The Company agrees that if any right of any Indemnified Party set forth in the preceding paragraphs is finally judicially determined to be unavailable (except by reason of the gross negligence or bad faith of such Indemnified Party), or is insufficient to hold such Indemnified Party harmless against such Losses as contemplated herein, then the Company shall contribute to such Losses (i) in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and such Indemnified Party, on the other hand, in connection with the transactions contemplated hereby, and (ii) if (and only if) the allocation provided in clause (i) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Company and such Indemnified Party; provided, however, that in no event shall the amount, if any, to be contributed by all Indemnified Parties exceed the amount of the fees actually received by SCG hereunder. Benefits received (or anticipated to be received) by the Company shall be deemed to be equal to the aggregate cash consideration and value of securities or any other property payable, exchangeable or transferable in any proposed or potential transactions within the scope of this Agreement, and benefits received by SCG shall be deemed to be equal to the compensation payable by the Company to SCG in connection with this Agreement. Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct related to information provided by the Company or other conduct by the Company (or the Company's employees or other agents) on the one hand or by SCG on the other hand. The parties agree that it would not be just and equitable if contribution were determined by pro rata allocation or by any other method of allocation which does not take into account the equitable considerations referred to above.

The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with advice or services rendered or to be rendered by any Indemnified Party pursuant to this Agreement, the transactions contemplated hereby or any Indemnified Party's actions or inactions in connection with any such advice, services or transactions except for Losses of the Company that are finally judicially determined by a court of competent jurisdiction to have arisen out of the gross negligence or bad faith of such Indemnified Party in connection with any such advice, actions, inactions or services.

The rights of the Indemnified Parties hereunder shall be in addition to any other rights that any Indemnified Party may have at common law, by statute or otherwise. Except as otherwise expressly provided for in this Exhibit A, if any term, provision, covenant or restriction contained in this Exhibit A is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement all remain in full force and effect and shall in no way be affected, impaired or invalidated. The reimbursement, indemnity and contribution obligations of the Company set forth herein shall apply to any modification of this Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Person's services under or in connection with, this Agreement.

# **Exhibit E**

-----Original Message-----
From: Mike Lederman
Sent: Thursday, August 05, 2004 11:29 AM
To: 'Conway, Steve'
Subject: RE: Engagement Letter

Sure. Just handwrite it in and initial. I'll do the same on the copy I send back to you.

Michael G. Lederman
Managing Partner
The Spectrum Capital Group, LLC
471 Hope Street
Bristol, Rhode Island 02809
v: 401.396.9777
f: 401.396.9781
c: 505.228.2628
mgl@spectrumcapitalgroup.com
www.spectrumcapitalgroup.com

-----Original Message-----
From: Conway, Steve [mailto:Steve.Conway@TeamLucor.com]
Sent: Thursday, August 05, 2004 11:10 AM
To: Mike Lederman
Subject: Engagement Letter

Mike, One word added if Ok with you. Another "material" in Para 3. Let me know if that is OK ?

Stephen P. Conway
CEO
Lucor, Inc.
Phone: (919) 828-9511 ext. 329
Facsimile: (919) 828-4847

> Note: This communication, including attachments, is for the exclusive
> use of addressee and may contain proprietary, confidential or

> privileged information. If you are not the intended recipient, any
> use, copying, disclosure, dissemination or distribution is strictly
> prohibited. If you are not the intended recipient, please notify the
> sender immediately by return email and delete this communication and
destroy all copies.
> <<Lucor Engagement Letter.doc>>
>
>
>

# Exhibit F

jiffy lube

LUCOR
790 PERSHING ROAD
RALEIGH, NC 27608
(919) 828-9511

RBC CENTURA BANK
RALEIGH, NC

66-85/531

00115439

DATE: 8/6/2004

AMOUNT: $25,000.00

PAY Twenty Five Thousand Dollars and 00 Cents

TO THE ORDER OF

THE SPECTRUM CAPITAL GROUP, LL
471 HOPE STREET
BRISTOL RI 02809

AMOUNTS OVER $50,000 REQUIRE 2 SIGNATURES

Security Features Included. Details on back.

⑈00115439⑈ ⑆053100850⑆021225269⑨⑈

Lucor, Inc. → JPS 000115439 00115439

| VENDOR ID | NAME | PAYMENT NUMBER | CHECK DATE |
|---|---|---|---|
| 0200-SPECTRUM | THE SPECTRUM CAPITAL GROUP, LL | 000000000000100900 | 8/6/2004 |

| OUR VOUCHER NUMBER | YOUR VOUCHER NUMBER | DATE | AMOUNT | AMOUNT PAID | DISCOUNT | WRITE-OFF | NET |
|---|---|---|---|---|---|---|---|
| 0000000000004119914 | 8/6/04 | 8/6/2004 | $25,000.00 | $25,000.00 | $0.00 | $0.00 | $25,000.00 |
| | | | $25,000.00 | $25,000.00 | $0.00 | $0.00 | $25,000.00 |

# Exhibit G

## The Spectrum Capital Group, LLC
# Lucor Deposits
### January 1, 2004 through April 17, 2007

| Type | Date | Num | Memo | Account | Split | Amount |
|---|---|---|---|---|---|---|
| Lucor | | | | | | |
| Deposit | 8/10/2004 | | Deposit | Fleet 94797 41847 | Revenue Income | 25,000.00 |
| Deposit | 11/1/2004 | | Deposit | Fleet 94797 41847 | Revenue Income | 25,000.00 |
| Deposit | 12/2/2004 | | Deposit | Fleet 94797 41847 | Revenue Income | 25,000.00 |
| Deposit | 1/3/2005 | | Deposit | Fleet 94797 41847 | Revenue Income | 25,000.00 |
| Deposit | 1/3/2005 | | Deposit | Fleet 94797 41847 | Client Reimbursement | 2,253.04 |
| Deposit | 2/4/2005 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 3/7/2005 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 3/7/2005 | | Deposit | Fleet 94797 41847 | Client Reimbursement | 5,175.35 |
| Deposit | 4/1/2005 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 5/5/2005 | | Deposit | Fleet 94797 41847 | -SPLIT- | 19,600.51 |
| Deposit | 6/1/2005 | | Deposit | Fleet 94797 41847 | -SPLIT- | 16,671.06 |
| Deposit | 7/1/2005 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 7/1/2005 | | Deposit | Fleet 94797 41847 | Client Reimbursement | 2,119.93 |
| Deposit | 8/2/2005 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 8/8/2005 | | Deposit | Fleet 94797 41847 | Client Reimbursement | 565.01 |
| Deposit | 9/2/2005 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 10/4/2005 | | Deposit | Fleet 94797 41847 | Client Reimbursement | 606.20 |
| Deposit | 10/11/2005 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 11/4/2005 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 11/17/2005 | | Deposit | Fleet 94797 41847 | Client Reimbursement | 1,587.17 |
| Deposit | 12/5/2005 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 1/5/2006 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 2/1/2006 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 3/1/2006 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 4/10/2006 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 5/8/2006 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 6/6/2006 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 7/5/2006 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 8/1/2006 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 9/1/2006 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 10/10/2006 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 11/6/2006 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |
| Deposit | 12/4/2006 | | Deposit | Fleet 94797 41847 | Revenue Income | 15,000.00 |

5/5/05 - #15,000 - Monthly Payment
4,600.51 - Expenses

6/1/05 #15,000 - Monthly Payment
1,671.06 - Expenses

# Exhibit H

Fleet

ıds Transfer Customer Service
1-800-729-9473

Account # 9479741847

THE SPECTRUM CAPITAL GROUP LLC
471 HOPE ST
BRISTOL RI 02809

MAY 05, 2005

Page 1 of 1

Any applicable transaction fee will appear on your account statement.

| | DEBIT | CREDIT |
|---|---|---|
| FEDWIRE IN Ref #000062 TRN: 050505-008861<br>ORG: LUCOR INC 790 PERSHING RD<br>RALEIGH, NC 276082712<br>FROM:RBC CENTURA BANK ROCKY MOUNT, NC<br>ABA/053100850<br>RFB: 20050505095438VJ | | $19,600.51 |

SUMMARY OF WIRES:

| TYPE | NUMBER | TOTAL |
|---|---|---|
| DEBITS | 0 | $.00 |
| CREDITS | 1 | $19,600.51 |

***** END OF STATEMENT *****

# Exhibit I

NORTHEN BLUE, L.L.P.
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
THE EXCHANGE AT MEADOWMONT
1414 RALEIGH ROAD, Suite 435
CHAPEL HILL, NORTH CAROLINA, 27517

JOHN A. NORTHEN
J. WILLIAM BLUE, JR.
DAVID M. ROOKS, III
CHARLES H. THIBAUT
CAROL J. HOLCOMB
EMILY A. CURTO
VICKI L. PARROTT
STEPHANIE OSBORNE-RODGERS
SAMANTHA HYATT CABE

MAILING ADDRESS:
P.O. BOX 2208
CHAPEL HILL, NC 27515-2208

TELEPHONE (919) 968-4441
TELEFAX (919) 942-6603
E-MAIL jan@nbfirm.com

October 3, 2005

To: Michael Lederman
Fax: 401.396.9781

From: John A. Northen

Re: Lucor, Inc.

Attached is the fully executed conflict waiver, sent to me by Lucor.

Todd V. Jones
Associate General Counsel
GE Capital Franchise Finance Corp.
17207 N. Perimeter Drive
Scottsdale, AZ 85255-5402
-and-
Robert L. Byman
Jenner & Block LLP
One IBM Plaza - Suite 4000
330 North Wabash Avenue
Chicago, IL 60611

Stephen P. Conway
Chief Executive Officer
Lucor Inc.
790 Pershing Rd.
Raleigh, NC 27608

Gentlemen:

GE Capital Franchise Finance Corp. ("GE Capital"), through its counsel Jenner & Block, LLP ("JBLLP"), wishes to retain Spectrum Capital Group ("SCG") as an expert witness for and financial advisor to them in connection with an arbitration proceeding styled American International Specialty Lines Insurance Company, Claimant and Counter-respondent v. GE Capital Franchise Finance Corporation, Respondent and Counter-Claimant. The scope section of the engagement letter provides that "SCG will provide consultation, analyses, and ultimately opinion testimony in the form of a report identifying and analyzing the factors and causes underlying the financial distress of the convenience store industry and other related work as may be requested by JBLLP." JBLLP has recently advised us that they plan to proffer us for deposition testimony and trial testimony.

Lucor, Inc. and its subsidiaries (Commonwealth Lubes, Inc., Pittsburgh Lubes, Inc., Quick 10 Corporation, Cincinnati Lubes, Inc., Carolina Lubes, Inc., Vircal Lubes, Inc., Atlanta Lubes One, LLC, Atlanta Lubes Two, LLC, Atlanta Lubes Three, LLC, Navigator Real Estate, LLC, Tennessee Lubes One, LLC, and Tennessee Lubes Two, LLC, and collectively with Lucor, Inc., referred to herein as "Lucor") has previously engaged SCG to provide strategic financial advisory services to Lucor in connection with a possible restructuring of certain obligations (the "Restructuring"), , a possible financing or financings (each a "Financing"), and to assist the Company in analyzing, structuring, negotiating and effecting the Restructuring and/or Financings.

Although SCG's existing engagement with Lucor has focused on negotiating a consensual restructuring of secured debt held by its principal secured lender (LaSalle Bank acting as Trustee for certain bondholders, serviced by GMAC), Lucor also has other secured debt which is held or serviced by GE Capital as successor to FFCA. Lucor

is making every effort to achieve a consensual workout with GMAC, but if a definitive agreement with GMAC cannot be achieved within a reasonable time there is the possibility that Lucor may elect to seek a restructuring in the context of chapter 11 proceedings. If such an election is made, Lucor would expect SCG to continue to act as its financial advisor and SCG intends to continue to provide such services. SCG would then have to disclose and seek approval of its dual representation of GE Capital and Lucor by the court, and SCG would expect to seek such approval based upon the consent of both parties to the dual representation.

Insofar as we can presently tell, the issues likely to arise in the work which GE Capital would expect SCG to do appear to be unrelated to the work SCG has been asked to or would appear likely to do for Lucor. However, in circumstances such as these it is appropriate to seek the advance written consent of both parties before proceeding with the engagement by GE Capital, to waive any conflict arising by reason of such dual representation and to avoid the appearance of any conflict, and to confirm that both parties are comfortable with proceeding on this basis.

In deciding whether or not to consent, you should consider how our representation of GE Capital and of Lucor, respectively, could or might affect you. For example, a client who is asked to waive or consent to conflicts typically should consider whether there is any material risk that SCG will be less zealous or eager on the client's behalf due to the conflict. Similarly, a client asked to waive a conflict should consider whether there is any material risk that client confidences or secrets will be used adversely to him or her due to the conflict.

In the present case, because of the unrelated nature of the work for the two clients, we do not believe that there is a material risk of either type. Nevertheless, these are issues that you should consider for yourself. In addition, you should bear in mind that if you consent, SCG will be representing Lucor adversely to GE Capital in connection with the Lucor matter referenced above.

Please review this matter carefully. If you have any questions or concerns that you would like to discuss prior to reaching a decision on this issue, please let me know. If you are willing to consent to such dual representation after such review as you believe appropriate, please sign a copy of this letter in the space provided and return it to SCG for our files.

Very Truly Yours,

Michael G. Lederman
Spectrum Capital Group

I hereby consent to the terms of representation set forth above:

Dated: 9/30/05

GE Capital Franchise Finance Corp.

And

Jenner & Block LLP

By:

Dated: 10/13/05

Lucor, Inc.

By: ____________

# **Exhibit J**

-----Original Message-----
From: Conway, Steve [mailto:Steve.Conway@TeamLucor.com]
Sent: Monday, September 27, 2004 12:59 PM
To: Mike Lederman
Cc: Carr, Ken
Subject: Forecast

Mike, I ran the model making the adjustments in cars and ticket for our current operations trend this month and adjusting for the fact that the net DOB( Dollars over base) will come back up after the initial reaction to move cars in our operations. Ken nor Jerry has reviewed this yet.
However, I wanted you to take a look at it because if in fact this is our plan it makes the case that one or more of the following must be added to the plan. A) some poor performers must be closed B) some markets must be sold c) some of SG&A must be significantly reduced or D) A large JLI corp market must be added to spread overhead. if Joe Sands will send me your store level work sheets I can add to each store what I already know who and what each Landlord might be willing to do.
Let me know your thoughts.

Stephen P. Conway
CEO
Lucor, Inc.
Phone: (919) 828-9511 ext. 329
Facsimile: (919) 828-4847

Note: This communication, including attachments, is for the exclusive
> use of addressee and may contain proprietary, confidential or
> privileged information. If you are not the intended recipient, any
> use, copying, disclosure, dissemination or distribution is strictly
> prohibited. If you are not the intended recipient, please notify the

> sender immediately by return email and delete this communication and
destroy all copies.
>
> <<Forecast by Region 2004 thru 2006 Spect.xls>>
>

# Exhibit K

-----Original Message-----
From: Carr, Ken [mailto:Ken.Carr@teamlucor.com]
Sent: Wednesday, April 13, 2005 2:45 PM
To: Joe Sands
Cc: Conway, Steve; Conway, Jerry
Subject: Cash Requirements 13 Wks 04-13-05.xls

Joe

Here's a look at the 13 week forecast. Would you review it and let me know what you think or if any changes need to be made. I plan on only sending the first tab.

<<Cash Requirements 13 Wks 04-13-05.xls>>

# Exhibit L

-----Original Message-----
From: Joe Sands
Sent: Tuesday, May 10, 2005 6:16 PM
To: Mike Lederman
Subject: Fw: Post Filing Cash Flow

Got this from ken. He also said he wants to try to handle stuff over the phone and email unless we have to have a meeting. He's got some family events coming up graduations and his wife having a baby etc. He is also pulling northens stuff together. Northen has been spending couple hours there at a time and said if we were local we could spend a couplke hours too rahter than by phone. He has not talked to steve about us coming out as steve is in houston.
He was a little tudy.

We also gotta talk to them about post filing p/r and internal communications.

--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Carr, Ken <Ken.Carr@teamlucor.com>
To: Joe Sands <JPS@spectrumcapitalgroup.com>
CC: Conway, Steve <Steve.Conway@TeamLucor.com>
Sent: Tue May 10 16:13:26 2005
'ubject: Post Filing Cash Flow

Attached is a start on the post-filing cash forecast. The tab labeled ActualForecast is the summary. I've presumed a June 1 filing for this, but any date would not change it

significantly. The following are my observations/questions:

Receipts are based on daily receipts - For Credit cards and checks, we receive the funds 2 business days later. Should I bother with this?
Does it really matter since it is a rolling 2 day issue?

401(k) - I presume we pay out the previous month just prior to filing

APU - Payroll - I presume they will need to pay us as payroll is issued.
Inventory - I've presumed that we will pay weekly based on shipments since we will be unable to pay pre-petition AP

PCC Checks and Gift Checks - These are ones already issued. I presume we will continue to accept them for redemption

Insurance - We have one final payment for the insurance year in June (the insurance year ends 7/31). I assumed we will have to pay 6 month's premium in advance. Also, Ohio Workers' comp is due by 8/31, which is on the schedule

Interest and Principal - Have listed payments for all loans except GMAC.
I'm not sure what to show for GMAC

JLI - Unsure what to show on this line. We have many different items that go through JLI. We receive credits for National fleets serviced at our service center, DSL usage and any JLI gift certificates we honor.
We are charged for royalty (approximately equal to the national fleet credit), rents, POS leases, POS software and hardware maintenance, credit card processing, real estate taxes, reminder mail and VSAT lease charges.

Leases - Am uncertain what and when the payments will be made on leases.

Oil vendors - This presumes either a lower price from SOPUS or the use of a competitive oil.

Rent - I presume no June rent payment but will begin in July. The amount shown assumes no store closures, however, this will be adjusted as the stores are identified.

Oil Deposits - Assumes a 2 week escrow

Utility Deposits - Assumes 2 month's charge deposit.

Payroll - This amount includes the net pay and employer taxes.

When you've taken a look at this, please call and we can discuss the answers to these items and how to reflect it on my schedule.

Ken

<<Cash Requirements Filing.xls>>
<<Cash Requirements Filing.xls>>

**From:** Joe Sands
**Sent:** Wednesday, May 18, 2005 2:57 PM
**To:** 'Carr, Ken'
**Cc:** Conway, Steve; Mike Lederman; Joe Sands
**Subject:** LUCOR: Post Filing Cash Flow

Ken,

see my responses in brackets below. call with any follow up.

Joe

-----Original Message-----
From: Carr, Ken [mailto:Ken.Carr@teamlucor.com]
Sent: Tuesday, May 10, 2005 4:13 PM
To: Joe Sands
Cc: Conway, Steve
Subject: Post Filing Cash Flow

Attached is a start on the post-filing cash forecast. The tab labeled Actual Forecast is the summary. I've presumed a June 1 filing for this, but any date would not change it significantly. The following are my observations/questions: [just to confirm - seasonality would not change things with a different filing month? Also, what impact does management expect on the public/customers/employees becoming aware of the filing (i.e. are we being conservative?)]

Receipts are based on daily receipts - For Credit cards and checks, we receive the funds 2 business days later. Should I bother with this? Does it really matter since it is a rolling 2 day issue? [As long as your comfortable, I think its ok since you do your disbursements weekly.]

401(k) - I presume we pay out the previous month just prior to filing [yes, presuming that would be ordinary course for Lucor; further contributions to the plan would be subject to first day motion/court approval]

APU - Payroll - I presume they will need to pay us as payroll is issued. [not sure of the question]

Inventory - I've presumed that we will pay weekly based on shipments since we will be unable to pay pre-petition AP- [good assumption, it will be either COD or deposits unless renegotiated post-petition at which time you can revise the forecast Sopus as well as other suppliers will also have a reclamation claim which will allow them to either get back their inventory provided 10 days before the filing or receive payment for same. These are usually negotiated or fought, but just wanted you to be aware of this. The relationship between OH as supplier to all of your entities and Carolina lubes as the provider of personnel to OH creates the possibility for a set off. Efforts should be made to manage the impact of this by narrowing the gap of a/p and a/r on these fronts.]

PCC Checks and Gift Checks - These are ones already issued. I presume we will continue to accept them for redemption [generally these gifts and warranty commitments are requested in first day motions to preserve customer relationships, if the court denies the motion (unlikely) your forecast will need to change.]

Insurance - We have one final payment for the insurance year in June (the insurance year ends 7/31). I assumed we will have to pay 6 month's premium in advance[is this per the terms of your insurance agreement?/ordinary course]. What will be the impact on the LC/CDs if any. I guess they may drag their feet before returning it.] Also, Ohio Workers' comp is due by 8/31, which is on the schedule [ok]

Interest and Principal - Have listed payments for all loans except GMAC. [creditors should get payments if a court order provides an "over secured creditor" with Adequate Protection ( a legal term) in which case they may be entitled to some level of payment (usually interest only). An over secured creditor is one in which the value of its collateral is greater than the amount outstanding on its loan.

I'm not sure what to show for GMAC[On a per loan basis some of their debt may be over secured and would be eligible for adequate protection payments--this is an analysis that could probably be determined from your model. We may try to fight it initially but to be conservative in our cash forecast we should include some level of adequate protection payment. Also keep in mind that creditors can argue that their stores values are declining in value and therefore need adequate protection payments too. We should not put that in the cash plan as of yet.]

JLI - Unsure what to show on this line. We have many different items that go through JLI. We receive credits for National fleets serviced at our service center, DSL usage and any JLI gift certificates we honor. We are charged for royalty (approximately equal to the national fleet credit), rents, POS leases, POS software and hardware maintenance, credit card processing, real estate taxes, reminder mail and VSAT lease charges. [For these items, I would suggest consolidating into broad categories and put the non material items in a "JLI other category")(Spell out the acronyms too). We may condense these categories before providing this to outsiders. As another matter to keep in mind, we may be able to stop making franchise royalty payments until we decide to assume the franchise agreement. Obviously this could be a declaration of war or an effective negotiating tool.]

Leases - Am uncertain what and when the payments will be made on leases. [The goal will be to file just after the rents are due and not pay the rent. (i.e. file on July 8 having not paid rents or lease due on July 1st). Then pay all rents and leases postpetiiton until rejected. As stores are assumed, cure payments will need to be made up. This is a fairly new strategy based on the recent Kmart filing and John believes it's a good argument for us too. Otherwise leases are rejectable/assumable and the decision needs to be made within 60 days of filing unless a motion for an extension is granted by the court.

Oil vendors - This presumes either a lower price from SOPUS or the use of a competitive oil. [We need to be very careful here. In bankruptcy, which this forecast assumes, it will likely not be the case that sopus provides more favorable pricing in fact they may be more punitive seeking to get a recovery on their pre-petition debt from price recovery methods. Also, a new vendor may not give favorable terms to a company in ch 11. Overwhelming evidence to the contrary would be needed

before counting on this level of support.]

Rent - I presume no June rent payment but will begin in July [see above on leases]
Oil Deposits - Assumes a 2 week escrow-[will this be enough in sopus's eyes]

Utility Deposits - Assumes 2 month's charge deposit. [good-make sure to have a good contact list for utility companies to make the transition smoother]

Payroll - This amount includes the net pay and employer taxes. [i.e.. fully loaded] we may want to time payroll and the filing so there's no disruption (i.e. payroll on a Friday and file on a Sunday electronically; otherwise we'll need to get it in the first day orders]

When you've taken a look at this, please call and we can discuss the answers to these items and how to reflect it on my schedule.

Ken

<<Cash Requirements Filing.xls>>

# **Exhibit M**

-----Original Message-----
From: Mike Lederman
Sent: Monday, July 25, 2005 1:21 PM
To: Steve.Conway@TeamLucor.com
Cc: jan@nbfirm.com; JamieClarke
Subject: Planning

Steve --

Please take a look at the attached memo.

Michael G. Lederman
Managing Partner
The Spectrum Capital Group, LLC
471 Hope Street
Bristol, Rhode Island 02809
v: 401.396.9777
f: 401.396.9781
c: 505.228.2628
mgl@spectrumcapitalgroup.com
www.spectrumcapitalgroup.com

<<LukeCh11Planning.doc>>

# THE SPECTRUM CAPITAL GROUP, LLC

*Investment and Merchant Bankers*

## MEMORANDUM

**Date:** July 25, 2005

**To:** Steve Conway

**From:** Mike Lederman

**Re:** Chapter 11 Planning

It seems that the planning and legwork for an orderly filing are well under way. Notwithstanding that deals along the lines of the ones we've been discussing with GMAC and SOPUS would clearly be better for all concerned, these preparations are worthwhile as the likelihood of a filing has probably increased with i) the lack of timely, productive responses from GMAC and SOPUS, ii) the encroaching deadline of the new bankruptcy code provisions, and iii) Lucor's strong insistence that the restructuring not leave it hobbled going forward.

With these considerations as background, it's probably time that we engage in some more intensive thinking about the other side of the coin of a filing -- planning the exit, including defining what "success" might be in terms of the reorganization. While notions of success will surely shift with the ebb and flow of the proceedings themselves, a few things about the in-court reorganization process are certain.

First, relative to the deal world, Chapter 11 is (and will seem to you) inordinately slow and inefficient, in large part because of the formalization of the rights of Lucor's various constituencies (but principally GMAC and SOPUS) to be part of any decision that has any semblance of strategic significance. Hence, you've got to adjust your expectations about timing and responsiveness in order to prevent an early and severe case of deal fatigue. I'm saying, in essence, that it's important to have the knowledge about how the case is likely to proceed so that you can regulate and properly assess your expectations of progress.

Second, it's hard to anticipate a successful reorganization without the eventual support of either or both of GMAC and SOPUS. Given that we can easily conjure scenarios that fill the spectrum between friendliness and hostility with these stakeholders, let's give serious thought to how we want to preserve our relationship with them during the early days of a filing. One way of doing this with GMAC would be to begin discussions now about an agreed-upon cash collateral order. Once the inevitability of a filing becomes clear to SOPUS, perhaps we can discuss with them the need to immediately implement many of the items set forth in the term sheet we've presented to them.

Third, you and your team of managers and professionals are strong and are thus likely to be accorded deference and respect by the bankruptcy court early in the case. As the case proceeds,

however, the onus of making progress is likely to grow more burdensome, particularly if either GMAC or SOPUS are taking positions consistently adverse to Lucor's. Therefore, to the extent we can articulate a good, strong, fair rationale for the reorganization Lucor seeks as the debtor, the more likely we are to maintain the court's respect and support. Having a good, strong story and plan from the initial filing forward can be important.

There are clearly several alternative directions Lucor can take out-of-the-box. Although I discuss a few of them below, there are certainly other strategic alternatives that we may want to consider seriously.

The first direction would, in essence, be a continuation of the current negotiations, with the hope that with more time and without the pressure of the impending filing deadline, reasonable, mutually acceptable accommodations can be reached with GMAC and SOPUS. This alternative probably warrants serious consideration only if we felt we were close enough to acceptable deals pre-filing.

More likely would be a deal with GMAC that would not be as rich as the one Lucor offered pre-petition. To demonstrate the value of its collateral and hence the Company's GMAC indebtedness upon exit, we might actually invite GMAC to control and conduct sales of a few stores. In this context, we would certainly look to SOPUS for a deal at least as good as the one now pending.

A different approach would be to focus principally on the tentative agreements you've reached with JLI and SOPUS with the goal of implementing things like lease rejections and COGS reductions from the beginning of the proceedings. Lucor could consider attempting to obtain "critical vendor" status for SOPUS, and whether successful or not, the effort would show the court and GMAC that the relationship is important to Lucor and strong. Given the likelihood that Lucor will have a large preference claim against SOPUS, this alternative may be attractive to them. In this context, the Lucor/SOPUS alliance could be strengthened if SOPUS were also to offer a "comfort DIP".

Instead, Lucor could attempt to implement its tentative agreements with JLI while seeking an alternative to Pennzoil as a vendor. This would preserve much of Lucor's preference claim and might be something GMAC would favor, and as such, could provide a basis for seeking concessions from and a deal with GMAC.

You might conclude that the company should reorganize around the best stores and markets only. This could be attractive if GMAC wanted its collateral back badly enough to trim or forego any deficiency claim it might have on the non-core stores. Any GMAC debt associated with the core stores would be reinstated at par.

Finally, you might conclude that "the juice just isn't worth the squeeze" from your perspective and that the best course would be for you to cooperate with GMAC in implementing its plan to maximize value from its collateral, in exchange for appropriate treatment of you and your management team under a KERP.

* * *

I've covered a lot of ground above without full-blown exploration of the various alternatives covered. On top of that, as I mentioned there are probably several other strategies that merit consideration. In any case, I hope this is helpful in focusing us on Lucor's strategy if a filing must be made. I'll give you some time to digest all this and will then call to discuss.

cc: John Northen, Esq.
Jamie Clarke, Esq.

# Exhibit N

-----Original Message-----
From: Conway, Steve [mailto:Steve.Conway@TeamLucor.com]
Sent: Tuesday, December 06, 2005 11:20 AM
To: Mike Lederman
Subject: FCCA GEC and Lucor Debt

Mike, This is the proposed approach. Call me to discuss.
You would present the current situation of their specific property loans and our current general financial situation. Tell them we are negotiating with SOPUS who has agreed to certain concessions and GMAC who may or may not reach an agreement with us. We would like from
them:

1. 24 month reduction in debt service by 40% , deferred principal payments and accrued interest added to the principal balance and balloon at the term. This amounts to about $700K. Normal payments there after. This would give us a current 1 tol coverage on the loans.
2. Waiver of prepayment penalties for 24 months so that we can attempt to sell and leaseback in order to fully payoff the debt ASAP..

What do you think?

Stephen P. Conway
CEO
Lucor, Inc.
hone: (919) 828-9511 ext. 329
facsimile: (919) 828-4847

> Note: This communication, including attachments, is for the exclusive
> use of addressee and may contain proprietary, confidential or

> privileged information. If you are not the intended recipient, any
> use, copying, disclosure, dissemination or distribution is strictly
> prohibited. If you are not the intended recipient, please notify the
> sender immediately by return email and delete this communication and
'estroy all copies.

<<FFCA Fin Analysis 10-05.xls>> <<BS 09-05.XLS>> <<IS 09-05.XLS>>

# Exhibit O

---

**From:** Carr, Ken [mailto:Ken.Carr@teamlucor.com]
**Sent:** Fri 4/21/2006 10:10 AM
**To:** Mike Lederman; Joe Sands
**Subject:** 2004 Audit

We are finally completing the 2004 audit and I need some help in crafting a paragraph to discuss our restructuring. Do you have any examples of language used by others in their audited financial statements discussing their restructuring agreements? This would help me with some ideas.

Ken Carr

**From:** Mike Lederman
**Sent:** Friday, April 21, 2006 8:01 PM
**To:** Carr, Ken; Joe Sands
**Subject:** RE: 2004 Audit

We'll survey for some examples and get back to you.

Michael G. Lederman
Managing Partner
The Spectrum Capital Group, LLC

471 Hope Street
Bristol, RI 02809
v: 401.396.9777
f: 401.396.9781
c: 505.228.2628
mgl@spectrumcapitalgroup.com
www.spectrumcapitalgroup.com

---

**From:** Carr, Ken [mailto:Ken.Carr@teamlucor.com]
**Sent:** Fri 4/21/2006 10:10 AM
**To:** Mike Lederman; Joe Sands
**Subject:** 2004 Audit

We are finally completing the 2004 audit and I need some help in crafting a paragraph to discuss our restructuring. Do you have any examples of language used by others in their audited financial statements discussing their restructuring agreements? This would help me with some ideas.

Ken Carr

**From:** Joe Sands
**Sent:** Monday, April 24, 2006 9:48 AM
**To:** 'Carr, Ken'
**Subject:** RE: 2004 Audit

Here's one that may work for you. Hope all is well.
Joe

---

**From:** Carr, Ken [mailto:Ken.Carr@teamlucor.com]
**Sent:** Friday, April 21, 2006 1:14 PM
**To:** Joe Sands
**Subject:** RE: 2004 Audit

That will work. I'm not sure what is the best way to go about writing an informatively vague footnote that alerts the reader but doesn't tell him anything of substance.

-----Original Message-----
**From:** Joe Sands [mailto:JPS@spectrumcapitalgroup.com]
**Sent:** Friday, April 21, 2006 12:52 PM
**To:** Ken.Carr@TeamLucor.com
**Subject:** Re: 2004 Audit

Yes I'll need to get those to you on monday if that's ok.

-----Original Message-----
From: Carr, Ken <Ken.Carr@teamlucor.com>
To: Mike Lederman <MGL@spectrumcapitalgroup.com>; Joe Sands <JPS@spectrumcapitalgroup.com>
Sent: Fri Apr 21 10:10:52 2006
Subject: 2004 Audit

We are finally completing the 2004 audit and I need some help in crafting a paragraph to discuss our restructuring. Do you have any examples of language used by others in their audited financial statements discussing their restructuring agreements? This would help me with some ideas.

Ken Carr

**NOTE 13. DEBT RESTRUCTURING**

The owners of PRP and GMAC, the servicing agent for the lending institution that holds the note on the convenience stores leased by the Company, (see Note 3) have been negotiating an agreement concerning the disposition of PRP's $24 million note payable. The debt restructuring and refinancing proposal presented to GMAC by PRP and PRP's financial advisors is in final analysis and PRP is awaiting a final agreement. It is a common understanding between PRP and GMAC that a restructuring that reduces the cash flow burden to repay debt and defers or forgives certain debt payments is of mutual benefit to GMAC, PRP and the Company. Such restructuring may include, but not be limited to, the following: reduction or deferral of current monthly payments, reduction of interest rate, change in outstanding debt balances and change in the duration and terms of the loans. In addition, it is expected that rent payments from the Company to PRP will be reduced by approximately $380,000 per annum once the agreement is finalized. (Also see Note 11).