IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
C.A. No. 07-075

| | |
|---|---|
| THE SPECTRUM CAPITAL GROUP, LLC<br><br>Plaintiff,<br><br>v.<br><br>LUCOR, INC.<br><br>Defendant. | **DEFENDANT'S REPLY TO PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER** |

Defendant Lucor, Inc. ("Lucor"), by and through its undersigned counsel, respectfully submits this Reply to Plaintiff's Objection to Defendant's Motion to Dismiss or, in the Alternative, to Transfer, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3) and Local Civil Rule 7.

**NATURE OF THE MATTER BEFORE THE COURT**

On April 9, 2007, Lucor filed its Motion to Dismiss or, in the Alternative, to Transfer, on grounds that the court lacked personal jurisdiction over it and that Rhode Island was not the proper venue for this action. In support of its Motion, Lucor filed the affidavits of Stephen P. Conway ("Mr. Conway") and Michael D. Davis ("Mr. Davis"). After receiving a communication from Plaintiff's counsel regarding the execution of the Agreement at issue in this action, Lucor filed a Supplemental Memorandum in Support of Defendant's Motion to Dismiss or, in the Alternative, to Transfer. In connection with its Supplemental Memorandum, Lucor also filed supplemental affidavits of both Mr. Conway and Mr. Davis. On May 7, 2007, plaintiff The Spectrum Capital Group, LLC ("Spectrum") filed its Objection to Defendant's Motion to Dismiss or, in the Alternative, to Transfer and its Memorandum of Law and the affidavit of Michael G. Lederman in support thereof. This Reply is submitted in response to facts and

matters addressed in the Objection, Memorandum of law, and Affidavit of Michael G. Lederman, which were not addressed in its Memorandum and Supplemental Memorandum in support of its Motion to Dismiss or, in the Alternative, to Transfer.

## STATEMENT OF FACTS

Lucor incorporates by reference the facts set forth in its Memorandum in Support of Defendant's Motion to Dismiss or, in the Alternative, to Transfer and its Supplemental Memorandum in Support of Defendant's Motion to Dismiss or, in the Alternative, to Transfer. Lucor set forth below only those facts that supplement the facts set forth in Plaintiff's Memorandum of Law in Support of Its Objection to Defendant's Motion to Dismiss or, in the Alternative, to Transfer ("Memorandum of Law") or the Affidavit of Michael G. Lederman ("Lederman Affidavit") filed in support thereof.

### A. Initial Contact with Spectrum and Negotiation of the Agreement

In his affidavit, Mr. Lederman states that he was first contacted by Don Draughon, "a financial advisor/investment banker who was, at that time, associated with a Virginia-based firm." (Lederman Aff. ¶ 3.) Lucor, however, had no knowledge about Mr. Draughon's affiliation or association with a Virginia-based firm. (Conway 2d Supp. Aff. ¶ 5.) Indeed, Lucor's CEO, Mr. Conway, believed that Mr. Draughon had lived and worked in Durham, North Carolina for many years and, in particular, that Mr. Draughon was living and working in Durham during the summer of 2004 when Mr. Lederman was in contact with Mr. Draughon about Lucor. (*Id.* at ¶ 5.) Mr. Conway contacted Mr. Draughon to inquire who he had retained to assist in financial restructuring of his former company. (*Id.* at ¶ 6.) Mr. Draughon then made the contact with Mr. Lederman of Spectrum (*see* Ex. A to Lederman Aff.), but Mr. Draughon did not inform Mr. Conway about Mr. Lederman's and Spectrum's move from New Mexico to Rhode Island

(Conway 2d Supp. Aff. ¶ 7). Further, Mr. Conway does not recall any telephone conversation with Mr. Lederman regarding his relocation. (*Id.* at ¶ 7.) Indeed, Mr. Conway did not know about the relocation of Spectrum or Mr. Lederman, but such relocation was immaterial to the negotiation and performance of the Agreement at issue. (*Id.* at ¶ 12.)

Although Mr. Lederman states that negotiations continued after he left North Carolina on August 3, 2004, he only points to the change of a single word in support of that assertion. (*See* Ex. E to Lederman Affidavit; Conway 2d Supp. Aff. ¶ 14.) On August 5, 2004, Mr. Conway e-mailed Mr. Lederman and asked if a single word, "material," could be inserted into the Agreement. (*See id.*) All the material terms of the Agreement were negotiated and agreed to when Mr. Lederman was in North Carolina and no additional material terms were negotiated after Mr. Lederman left North Carolina. (*See* Conway 2d Supp. Aff. ¶ 14.) Moreover, the litigation in this matter centers around Mr. Lederman's statements in the early August meeting in North Carolina regarding the definition of a "success fee" and Spectrum's contribution to any of the ultimate results of Lucor's financial restructure. (*Id.*)

**B. Spectrum's Location and the Performance of the Agreement**

1. Communications

Spectrum asserts that it has had its "sole place of business" in Rhode Island since June 2004. (Pl.'s Memo at 4.) Lucor was unaware of this fact. (Conway 2d Supp. Aff. ¶ 11.) Although Lucor's communications were sometimes directed to a mailing address or a telephone land line that happened to be in Rhode Island, the more common practice was to communicate with Spectrum employees through e-mail and cell phones, which practice permitted them to have been physically located almost anywhere. (*Id.* at ¶ 10.) In fact, at one point Mr. Lederman told Mr. Conway during a telephone conversation that the communication originated from his boat in

the Gulf of Mexico. (*Id.*) Lucor employees had no way to know where Mr. Lederman or Spectrum employees were located when they were communicating with Lucor employees via cell phones and e-mail. (*Id.*) Mr. Conway did not inquire as to Mr. Lederman's physical location when they spoke or e-mailed because it simply made no difference to the performance of the Agreement. (*Id.*)

2. <u>Performance of the Agreement</u>

The physical locations of Spectrum and Mr. Lederman were irrelevant to the Agreement at issue. (*Id.* at ¶ 9.) Lucor contracted with Spectrum for the provision of financial and consulting services based on Mr. Lederman's specific claim to have personal relations with GMAC personnel and GMAC's legal counsel. (*Id.* at ¶ 9.) The information Spectrum used to perform its services was provided out of Lucor's Raleigh, North Carolina office. (*Id.*) Those services could have been performed by people located anywhere in the world, but they were to be directed toward and provided to Lucor at its principal place of business in North Carolina. (*Id.*) Indeed, Lucor did not know where the services were being performed or where Mr. Lederman or others at Spectrum at the time of their performance. (*Id.* at ¶ 10.) Where any Spectrum employees were at any given time was not important to the performance of their contract, except to the extent they were needed at meetings, none of which took place in Rhode Island. (*Id.*) In contrast with Spectrum employees, who traveled frequently to North Carolina, none of Lucor's 1,800 employees traveled to Rhode Island in connection with the negotiation or performance of the Agreement. (*Id.* at 16.)

Further, during the negotiation of the Agreement, Lucor would have had no way of determining whether Rhode Island was simply the new home of Mr. Lederman or the principal business location of Spectrum because Spectrum was not registered to do business in Rhode

Island until August 2004. (*Id.* at 11.) Even after the purported move away from New Mexico in June 2004, Mr. Lederman sent Mr. Conway an e-mail dated August 4, 2007 that bore a signature line with an Albuquerque, New Mexico address. (*See* Ex. D to Lederman Affidavit; Conway 2d Supp. Aff. ¶ 12.) The communications from Mr. Lederman which bore both a Rhode Island and a New Mexico address during the same time period were, at best, suggestive that perhaps Spectrum or Mr. Lederman was maintaining offices in both locations. (Conway 2d Supp. Aff. ¶ 12.)

3. Physical Contacts of the Parties with Rhode Island and North Carolina

Mr. Lederman's visit to North Carolina to negotiate the contract was one of many personal trips to North Carolina made by Mr. Lederman. (*Id.* at ¶ 13.) In fact, apparently Mr. Lederman visits family in North Carolina. (*See* Ex. A to Lederman Aff.) Mr. Lederman traveled to North Carolina on six to eight occasions in connection with the Agreement at issue. (*Id.*) In fact, some of these visits are referenced in e-mail communications that Mr. Conway had with Mr. Lederman. (*See* Ex. A to Conway 2d Supp. Aff.) As a part of Spectrum's performance, Mr. Lederman was expected to travel to North Carolina. (Conway 2d Supp. Aff. ¶ 17.) It was never expected that Lucor would travel to Spectrum, wherever it chose to locate. (*Id.*) Thus, for example, in an August 30, 2004 e-mail from Mr. Conway to Mr. Lederman, Mr. Conway informed Mr. Lederman it would be important for him to attend a particular meeting in North Carolina and Mr. Lederman responded that he would attend the meeting. (*See* Ex. B to Conway 2d Supp. Aff. Ex. B.)

4. Rob Ells

Mr. Lederman asserts in his affidavit that Rob Ells, a GMAC asset manager, personally resided in Rhode Island and that Mr. Ells was assigned to Lucor's debt restructuring. (*See*

Lederman Aff. ¶ 28.) Mr. Ells was an independent contractor of GMAC. (Conway 2d Supp. Aff. ¶ 13.) Mr. Lederman only avers that Mr. Ells maintained a "home office" in Rhode Island and not a business location. (*See* Lederman Aff. ¶ 28.) Mr. Conway has no recollection that Mr. Ells resided in Rhode Island, although he has no reason to believe that Mr. Ells did not reside there. (Conway 2d Supp. Aff. ¶ 13.) The only meetings, one or two, that Lucor had with Mr. Ells were at GMAC's counsel's office in Washington, DC. (*Id.*) As with Mr. Lederman, where Mr. Ells personally resided was irrelevant to the restructuring of Lucor's debt and Mr. Conway did not inquire as to his personal residency. (*Id.*)

## ARGUMENT

### I. THE COURT SHOULD GRANT LUCOR'S MOTION TO DISMISS BECAUSE THE COURT LACKS PERSONAL JURISDICTION OVER LUCOR.

#### A. Plaintiff's Claims Do Not Arise Out of Lucor's Limited Contacts with the State of Rhode Island.

Spectrum makes two primary points in its Memorandum of Law regarding the relatedness requirement: first, that the Court should look to both whether the defendant's contacts with the forum were instrumental in either the formation or the alleged breach; and second, that the Agreement at issue was formed in large part through Lucor's contacts with Rhode Island. Lucor's contacts with the forum state, however, were neither instrumental to the formation of the contract or its alleged breach. Nor was the Agreement formed through Lucor's contacts with Rhode Island.

First, Spectrum states that the Agreement was negotiated through contacts with Rhode Island and points to e-mail communications after Mr. Lederman left North Carolina. However, Spectrum's own statement of the facts, the Affidavit of Michael G. Lederman, and the evidence belie that statement. Spectrum states, "On August 4, 2004, Lederman e-mailed a new draft of the Agreement to Conway, incorporating changes they had discussed ***during their meeting***, and

making arrangements for the Agreement's execution." (Pl.'s Memo at 5 (emphasis added).) This statement does not suggest that any additional negotiations were conducted after Mr. Lederman left North Carolina; rather, it suggests that the discussions in North Carolina formed the basis for the revisions to the Agreement. Spectrum offers a single e-mail communication to support its claim that "The parties [] continued to negotiate the terms of the Agreement via e-mail" after Mr. Lederman's meeting with Mr. Conway in North Carolina on August 3, 2004. (Pl.'s Memo at 5.) That e-mail is from Mr. Conway to Mr. Lederman requesting the insertion of a single word into the Agreement. (*See* Ex. E to Lederman Affidavit.) The insertion of a single word, "material," cannot accurately be characterized as continuing negotiations—it is clear from the evidence proffered by both parties that the material terms of the Agreement were negotiated and agreed upon during the meeting in North Carolina.

Spectrum also apparently seeks to rely on e-mail communications that pre-date the meeting in North Carolina as support for its assertion that the contract was formed out of Lucor's contacts with Rhode Island. However, as discussed above, Lucor had no actual or constructive knowledge that Spectrum was based solely or primarily in Rhode Island until it registered with the Rhode Island Secretary of State on or about August 3, 2004. Further, the nature of e-mail communications makes it possible to communicate with a person who is located virtually anywhere. Moreover, although the parties were discussing the terms of the contract from different locations, no meeting of the minds was reached as to any material term in any of the e-mails proffered by Spectrum. On balance, the evidence before the Court supports Mr. Conway's recollection that all the material terms of the Agreement were negotiated and agreed to during the meeting in North Carolina.

Second, Spectrum correctly cites *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 289 (1st Cir. 1999), for the proposition that a court should look to "the elements of the cause of action and ask whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." Spectrum, for good reason, does not elaborate on the facts of the case. In *Phillips Exeter*, a private school brought tort and breach of contract claims against an out-of-state fund that was obligated by a bequest to share profits with the school. *Id.* at 286. The testator, Mr. Phillips, resided in Florida, where his will was executed. *Id.* As a condition of the bequest, Mr. Phillips' will required the Howard Phillips Fund, located in Florida, to pay Phillips Exeter Academy, located in New Hampshire, at least five percent of the net income from certain stock. *Id.* Phillips Exeter sued the Fund, alleging that it had not received the five percent of the Fund's annual income to which it was entitled. *Id.* at 287. The district court concluded that the causes of action pleaded by Phillips Exeter did not arise out of the Fund's contacts with New Hampshire. *Id.* at 288. The district court found that, although the Fund transmitted checks to Phillips Exeter once a year, sent some letters to Phillips Exeter, and, by contrast to the facts in this case, even visited Phillips Exeter on one occasion regarding a possible settlement; the contract, if it had been breached, it had been breached in Florida where the Fund decided what amounts would be disbursed to Phillips Exeter. *Id.* at 289. The First Circuit noted the "painstakingly thoughtful analysis" of the district court and affirmed the dismissal. *Id.* at 289. Here, the same analysis would apply. If formation of the contract occurred in either North Carolina or Rhode Island, it occurred in the face-to-face meeting in North Carolina. If Lucor breached the Agreement, any breach would have occurred in North Carolina, where it decided whether to pay Spectrum the amounts to which it claims it is entitled.

Spectrum also relies on *Brian Jackson & Co. v. Eximias Pharm. Corp.*, 248 F. Supp. 2d 31 (D.R.I. 2003), to support its contention that one party's execution of a contract in a forum state is, alone, sufficient contact for a court to exercise jurisdiction over the non-resident party. The Supreme Court, however, has recognized that, "If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). In addition, Spectrum overlooks some key facts in *Brian Jackson*. In *Brian Jackson*, the defendant in essence represented to the world that the plaintiff was its officer. The district court found that defendant provided plaintiff with his own business card that listed plaintiff as a Vice President of defendant, thereby presenting plaintiff to the outside world as an employee of defendant. *Id.* at 36 and n.4. Plaintiff's name and Rhode Island home and cell phone numbers were listed on defendant's interoffice phone list. *Id.* Moreover, plaintiff stated that defendant urged him to conduct business out of his home in Rhode Island as a cost-saving measure. *Id.* The *Brian Jackson* court observed that the agreement was negotiated and formed, at least on the plaintiff's end, in Rhode Island and that plaintiff presented "considerable evidence" that the defendant frequently corresponded by e-mail, facsimile, and telephone to Rhode Island. *Brian Jackson*, 248 F. Supp. 2d at 35-36.

The facts in *Brian Jackson* are quite distinct from the ones at hand—Spectrum has not alleged, and cannot truthfully allege, that Lucor ever represented that Mr. Lederman or Spectrum were its officers or employees, or that Lucor urged Mr. Lederman or other Spectrum employees to conduct their work in Rhode Island. The e-mails and telephone calls between Rhode Island and North Carolina occurred simply because spectrum made a unilateral decision to locate its business there. Other than sending payments to Rhode Island and communicating with Spectrum

employees, when they happened to be there, Lucor took no steps to avail itself of the protections and benefits of Rhode Island law. *Brian Jackson* is, therefore, distinguishable and does not stand for the proposition that a plaintiff's negotiation and execution of an agreement in the forum state is a sufficient basis on which to exercise personal jurisdiction.

Finally, Spectrum seeks to rely on the alleged residency of GMAC asset manager Rob Ells as an additional contact that Lucor had with the state of Rhode Island. The personal residency of Mr. Ells is irrelevant. Mr. Ells was an independent contractor of GMAC who GMAC assigned to the Lucor debt restructuring. Lucor had no involvement in selecting Mr. Ells. Moreover, when Lucor met with Mr. Ells on one or two occasions, the meetings took place in GMAC's counsel's Washington, DC office. Mr. Ells' unilateral choice of where to live should not be factored in as an additional contact that Lucor had with the state of Rhode Island—the element of voluntariness in such a connection is completely absent under these circumstances.

In sum, the evidence demonstrates that the August 2004 meeting in North Carolina was critical to the formation of the Agreement and that the parties reached a meeting of the minds as to the material terms of the Agreement during that meeting. No negotiations about material terms continued after the meeting in North Carolina and neither substantial nor numerous changes were made to the Agreement after the meeting. Further, First Circuit case law suggests that, to the extent the Court is inclined to look at Lucor's contacts related to the purported breach of the Agreement, the breach, if it occurred, occurred in North Carolina.

### B. Lucor Has Not Purposefully Availed Itself of the Privilege of Conducting Business Activities in Rhode Island.

As the First Circuit has recognized, "Without evidence that the defendant actually reached out to the plaintiff's state of residence to *create* a relationship—say, by solicitation—the

mere fact that defendant willingly entered into a tendered relationship does not carry the day." *Phillips Exeter*, 196 F.3d at 292 (internal citations omitted). Further, "Even if a defendant's contacts with the forum are deemed voluntary, the purposeful availment prong of the jurisdictional test investigates whether the defendant benefited from those contacts in a way that made jurisdiction foreseeable." *Id.*

Spectrum in its Memorandum in Support focuses exclusively on communications, mostly electronic in nature, with Lucor as forming the basis for the Court's exercise of personal jurisdiction over Lucor. (*See* Pl.'s Memo at 4-8, 12-14.) Spectrum cites various case law in support of its argument that these communications alone are sufficient; however, Spectrum does not paint a complete picture of those cases.

First, Spectrum relies on *Burger King Corp.*, *Brian Jackson*, and *Dynamic Concepts, Inc. v. Modern Chain Mfg. Co., Inc.*, 610 F. Supp. 285 (D.R.I. 1985), in support of its argument that electronic, mail, and wire communications are sufficient to give rise to personal jurisdiction. As the First Circuit has recognized, however, "The defendant in *Burger King* not only sent regular payments to the plaintiff in the forum state ***but also assumed the plaintiff's identity and submitted to a host of regulations that the plaintiff imposed as part of a relationship that the defendant initiated.***" *Phillips Exeter*, 196 F.3d at 292 n.3 (emphasis added). Such is not the case here. In *Brian Jackson*, as discussed above, however, the defendant did much more than simply communicate with plaintiff in Rhode Island. Also in contrast to the facts here, *Dynamic Concepts* involved an agreement pursuant to which the plaintiff became the exclusive agent of the defendant and was "obligated to take a panoply of activity on defendant's behalf and to forego representation of all other gold chain manufacturers." *Dynamic Concepts*, 610 F. Supp. at 288.

Second, Spectrum cites *Northeastern Land Servs., Ltd. v. Schulke*, 988 F. Supp. 54 (D.R.I. 1997) and *Lantor, Inc. v. Nicassio Corp.*, No. CA06-46S, 2007 WL 204015 (D.R.I. Jan. 24, 2007) for the proposition that Lucor's "longstanding business relationship with Spectrum . . . was filled with countless purposeful contacts directed into Rhode Island." (*See* Pl.'s Memo. at 14). In *Northeastern Land*, the court found that: the defendant was hired to work as a senior manager at the plaintiff's office in Providence, Rhode Island; defendant was the one-third minority shareholder, a director, and the vice president of a Rhode Island corporation; defendant performed many of his employment-related duties in Rhode Island; and, in a two-year period, defendant made more than 25 visits to Rhode Island and spent in excess of 63 days in the forum. *Northeastern Land*, 988 F. Supp. at 56. The court did not simply rely on the "longstanding relationship" between the plaintiff and defendant in *Northeastern Land*; rather the court looked at the type and quality of the contacts that comprised the relationship and held that personal jurisdiction was proper based on those contacts.

In *Lantor*, the defendant purchased materials manufactured in Rhode Island from a Rhode Island corporation over a period lasting more than three years. *Lantor*, 2007 WL 204015, at *9. Rather than a single agreement, there were multiple transactions over an extended time period. *Id.* Such is not the case here where only a single agreement is involved and the subject of the agreement was services, which could be performed anywhere, not goods tied to a particular manufacturing location. In none of the cases cited by plaintiff is the type and quality of contacts precisely the same, or as limited, as the type and quality of contacts here.

**C. This Court's Exercise of Jurisdiction Over Lucor Would Not Be Reasonable.**

Spectrum misstates Lucor's argument as to the reasonableness inquiry: Lucor does not dispute that this Court is able to provide effective relief to the parties or that one party will be

inconvenienced wherever this case is litigated. Rather Lucor argues that North Carolina has a greater interest than Rhode Island and that it will be more inconvenienced by proceeding in Rhode Island than defendant would be by proceeding in North Carolina.

First, Spectrum argues that Rhode Island has a greater interest than North Carolina in adjudicating this dispute—that simply is not the case. To support this argument, Spectrum cites cases in which courts found that the absence of any choice-of-law provision selecting Rhode Island law as controlling did not weigh against Rhode Island's interest in adjudication. *See Rhode Island Trust Nat'l Bank v. San Gabriel Hydroelectric P'ship*, 667 F. Supp. 66, 70 (D.R.I. 1987) ("absence of such a provision is not determinative of the character of [defendant]'s conduct"); *Dynamic Concepts*, 610 F. Supp. at 289 and n.4 (noting that a contract did not specify whether Rhode Island law or New York law would govern).

Here, however, there is a negotiated choice-of-law provision selecting North Carolina law as controlling, which weighs in favor of North Carolina's interest in adjudicating the case. Although Lucor does not contend, as Spectrum suggests, that such provision "strips Rhode Island of jurisdiction" (Pl.'s Memo. at 17), the choice-of-law provision ***is*** one of the factors to be considered by the Court. *See, e.g., Burger King Corp.*, 471 U.S. at 481-82 (reasoning that a choice-of-law provision, "standing alone would be insufficient to confer jurisdiction," but taken in combination with the parties' relationship "reinforced [plaintiff's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there"); *Ceberus Partners, L.P. v. Gadsby & Hannah, LLP*, 836 A.2d 1113, 1120 (R.I. 2003) ("We are mindful that a choice of law provision in a contract should not be ignored when considering whether a party has voluntarily submitted to a forum's jurisdiction").

Second, Spectrum states, without specific factual support, that "most of the underlying conduct took place in Rhode Island." (Pl.'s Memo at 19). While some of Spectrum's conduct may have well taken place in Rhode Island because of its unilateral choice to do business there instead of any other state, that is not the case for the other actors involved in this transaction. Indeed, Lucor's conduct took place at its principal place of business in North Carolina, except for meetings elsewhere (none of which were in Rhode Island). (Conway Aff. ¶ 9.) Equally important, many of the key events in which Spectrum was involved took place outside Rhode Island. Indeed, Mr. Lederman traveled to North Carolina between six to eight times in connection with this Agreement, including the North Carolina visit in which the parties reached an agreement as to the material terms. Further, as discussed above, if Lucor has breached the Agreement, such breach occurred in North Carolina.

In sum, an accurate weighing of the evidence and a fair evaluation of the case law indicate that the Gestalt factors weigh against the reasonableness of the Court exercising personal jurisdiction over Lucor. Moreover, for the same reasons discussed above, venue in Rhode Island is improper and the interests of justice favor resolution of this dispute in North Carolina.

## CONCLUSION

For these reasons, as well as the ones stated in its Memorandum in Support of Defendant's Motion to Dismiss or, in the Alternative, to Transfer and Supplemental Memorandum in Support of Defendant's Motion to Dismiss or, in the Alternative, to Transfer, and based on the evidence before the Court, Lucor respectfully requests that the action be dismissed for lack of personal jurisdiction or be transferred to North Carolina.

~~This the _____ day of May~~, 2007.

Dated: May _, 2007

LUCOR, INC.,

By Its Attorneys,

/s/ Charles S. Beal
Charles S. Beal (#5559)
CAMERON & MITTLEMAN LLP
56 Exchange Terrace
Providence, RI 02903
401-331-5700
401-331-5787 (fax)

Date: May 21, 2007

/s/ Denise Smith Cline
Denise Smith Cline, N.C. State Bar No. 10837
SMITH MOORE LLP
2800 Two Hannover Square (Zip 27601)
Post Office Box 27525
Raleigh, North Carolina 27611
Telephone: (919) 755-8700
Facsimile: (919) 755-8800

Date: May 21, 2007

CERTIFICATION

The undersigned hereby certifies that on the 21st day of May, 2007, a copy of the foregoing was filed through the ECF system, and was served on the following recipients, as indicated below, identified as registered participants on the Notice of Electronic Filing (NEF):

VIA ECF TRANSMISSION

Heather A. Pierce, Esq.
Edwards Angell Palmer & Dodge, LLP
2800 Financial Plaza
Providence, RI 02903

VIA FIRST-CLASS MAIL, POSTAGE PREPAID

Steven M. Cowley, Esq.
Edwards Angell Palmer & Dodge, LLP
111 Huntington Avenue
Boston, MA 02199-7613

/s/ Charles S. Beal

G:\csb\Lucor\Lucor__Reply_re_Personal_Jurisdiction.DOC