IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
C.A. No. 07-075

THE SPECTRUM CAPITAL GROUP, LLC

Plaintiff,

v.

LUCOR, INC.

Defendant.

**SECOND SUPPLEMENTAL AFFIDAVIT OF STEPHEN P. CONWAY**

NOW COMES Stephen P. Conway who, being first duly sworn, deposes and says:

1. I am a citizen and resident of Wake County, residing at 7210 Ebenezer Church Road, Raleigh, North Carolina.

2. I am over the age of eighteen (18) and am otherwise competent to testify to the matters set forth herein.

3. I am Chief Executive Officer for the defendant Lucor, Inc. ("Lucor"), a position that I have held since 1990.

4. I have executed two previous affidavits in connection with the above-captioned action, one dated April 6, 2007 and one dated April 26, 2007, both of which were in support of Lucor's Motion to Dismiss or, in the Alternative, to Transfer. This affidavit responds to certain factual allegations made by plaintiff, The Spectrum Capital Group, LLC ("Spectrum") in its Objection to Defendant's Motion to Dismiss or, in the Alternative, to Transfer and by Michael Lederman in his Affidavit dated May 2, 2007.

5. In paragraph number 3 of his affidavit, Mr. Lederman avers that he was first contacted by Don Draughon, "a financial advisor/investment banker who was, at that time, associated with a Virginia-based firm." I have no knowledge about Mr. Draughon's affiliation or

association with a Virginia-based firm. I believe, however, that Mr. Draughon lived and worked in Durham, North Carolina for many years and during the summer of 2004 when the Mr. Lederman was in contact with him about Lucor.

6. I, in fact, contacted Mr. Draughon to inquire who he had retained to assist in financial restructuring of his former company, Convenience USA, Inc ("USA") where he had been the CEO. I was aware that Mr. Draughon had retained someone to assist in negotiating terms between his company and his Lender GMAC. Lucor was having a difficult time establishing meaningful dialogue with GMAC, whose was and is Lucor's senior Lender.

7. Mr. Draughon did not inform me about Mr. Lederman's and Spectrum's move from New Mexico to Rhode Island and I do not recall any telephone conversation with Mr. Lederman regarding his relocation.

8. Mr. Draughon stated to me that USA had retained Mr. Lederman but the company ended up in bankruptcy liquidation.

9. The physical locations of Spectrum and Mr. Lederman were irrelevant to the Agreement at issue. Lucor contracted with Spectrum for the provision of financial and consulting services based on Mr. Lederman's specific claim to have personal relations with GMAC personnel and GMAC's legal counsel. The information Spectrum used to perform its services was provided out of Lucor's Raleigh, North Carolina office. Those services could have been performed by people located anywhere in the world, but they were to be directed toward and provided to Lucor at its principal place of business in North Carolina. Lucor's conduct related to the Agreement took place at its principal place of business in North Carolina, except for meetings elsewhere, none of which took place in Rhode Island.

10. Further, I did not know where the services were being performed or where Mr. Lederman or others at Spectrum at the time of their performance. Although Lucor's

communications were sometimes directed to a mailing address or a telephone land line that happened to be in Rhode Island, the more common practice was to communicate with Spectrum employees through e-mail and cell phones. This practice permitted Spectrum to have been physically located almost anywhere. At one point Mr. Lederman stated the communication originated from his boat in the Gulf of Mexico. Lucor employees had no way to know where Mr. Lederman or Spectrum employees were located when they were communicating with us via cell phones and e-mail. I did not inquire as to Mr. Lederman's physical location when we spoke or e-mailed because it simply made no difference to the performance of the Agreement.

11. To the extent that Mr. Lederman asserts that Spectrum has had its principal place of business in Rhode Island since June 2004, that fact was unknown to Lucor. Indeed, Lucor would have had no way of determining whether Rhode Island was simply the new home of Mr. Lederman or the principal business location of Spectrum because Spectrum was not registered to do business in Rhode Island until August 2004.

12. Even after the purported move away from New Mexico in June 2004, Mr. Lederman sent me an e-mail dated August 4, 2007 that bore a signature line with an Albuquerque, New Mexico address. (*See* Ex. D to Lederman Affidavit.) The movements and relocations of Mr. Lederman and Spectrum were both unknown and immaterial to me or Lucor at the time of contracting and were not pertinent to the negotiation or performance of the Agreement. Moreover, the communications from Mr. Lederman which bore both a Rhode Island and a New Mexico address during the same time period are, at best, suggestive that perhaps Spectrum or Mr. Lederman were maintaining offices in both locations.

13. In paragraph number 28 of his affidavit, Mr. Lederman asserts that Rob Ells, a GMAC asset manager, personally resided in Rhode Island and that Mr. Ells was assigned to Lucor's debt restructuring. On information and belief, Mr. Ells was an independent contractor of

GMAC. I note that Mr. Lederman only avers that Mr. Ells maintained a "home office" in Rhode Island and not a business location. I do not have any recollection that Mr. Ells resided in Rhode Island, although I have no reason to believe that he did not. The only meetings, one or two, I had with Mr. Ells was in Washington, DC at GMAC's counsel's office there. As with Mr. Lederman, where Mr. Ells personally resided was irrelevant to the restructuring of Lucor's debt and I did not inquire as to his personal residency.

14. Although Mr. Lederman avers that negotiations continued after he left North Carolina on August 3, 2004, he only points to a single word change in support of that assertion. (*See* Ex. E to Lederman Affidavit.) On August 5, 2004, I e-mailed Mr. Lederman and asked if we could insert a single word, "material," into the Agreement. (*See id.*) The facts remain that all the material terms of the Agreement were negotiated and agreed to when Mr. Lederman was in North Carolina and that the litigation in this matter centers on Mr. Lederman's statements in that meeting as to the definition of a "success fee" and Spectrum's contribution to any of the ultimate results of Lucor's financial restructure.

15. By contrast with Lucor, whose 1,800 employees made no trips or visits to Rhode Island in connection with this transaction, Lederman's visit to North Carolina to negotiate the contract was one of many personal trips to North Carolina made by Mr. Lederman. Although I did not keep personal track of his trips to North Carolina in the performance of the Lucor contract, I believe there were six to eight such visits. Indeed, some of these visits are referenced in e-mail communications that I had with Mr. Lederman. For example, in an e-mail from Mr. Lederman to me dated July 24, 2007, Mr. Lederman notes that he invited his partner, Joe Sands, to attend the meeting in Lucor's offices on August 3, 2004. A true and accurate copy of this e-mail is attached as Exhibit A hereto.

16 Further, to the best of my knowledge, Spectrum has only one employee other than Mr Lederman and Mr. Sands Where Spectrum or its employees were at any given time was not important to the performance of their contract, except to the extent that they were needed at meetings with Lucor or GMAC, none of which occurred in Rhode Island

17 As a part of Spectrum's performance, Mr. Lederman was expected to travel to North Carolina It was never expected that Lucor would travel to Spectrum, wherever it chose to locate Thus, for example, in an August 30, 2004 e-mail from me to Mr Lederman, I tell Mr. Lederman it would be important for him to attend a particular meeting in North Carolina and Mr Lederman responded that he would attend the meeting A true and accurate copy of this e-mail is attached as Exhibit B hereto.

FURTHER THE AFFIANT SAYETH NOT

This the 21st day of May, 2007

Stephen P Conway

STATE OF NORTH CAROLINA

COUNTY OF WAKE

I certify that the following person personally appeared before me this day, and

- [x] I have personal knowledge of the identity of the principal
- [ ] I have seen satisfactory evidence of the principal's identity, by a current state or federal identification with the principal's photograph in the form of a ______________________________
- [ ] A credible witness has sworn to the identity of the principal;

acknowledging to me that he voluntarily signed the foregoing document for the purpose stated therein and in the capacity indicated: Stephen P. Conway.

Date: May 21, 2007

Cherie L. Cunningham

Cherie L. Cunningham, Notary Public
(print name)

(official seal)

My commission expires: December 27, 2010

[AFFIX NOTARY SEAL BELOW - NOTE THAT SEAL MUST BE **FULLY LEGIBLE**]

CHERIE L. CUNNINGHAM
NOTARY
PUBLIC
WAKE COUNTY, N.C.

US2000 9923654 1

CERTIFICATION

The undersigned hereby certifies that on the 21st day of May, 2007, a copy of the foregoing was filed through the ECF system, and was served on the following recipients, as indicated below, identified as registered participants on the Notice of Electronic Filing (NEF):

VIA ECF TRANSMISSION

Heather A. Pierce, Esq.
Edwards Angell Palmer & Dodge, LLP
2800 Financial Plaza
Providence, RI 02903

VIA FIRST-CLASS MAIL, POSTAGE PREPAID

Steven M. Cowley, Esq.
Edwards Angell Palmer & Dodge, LLP
111 Huntington Avenue
Boston, MA 02199-7613

/s/ Charles S. Beal